# EXHIBIT A

26SL-CC04688

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

# EXHIBIT A

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

# Direct Marketing Association Guidelines for Ethical Business Practice

The Direct Marketing Association's Guidelines for Ethical Business Practice are intended to provide individuals and organizations involved in direct marketing in all media with generally accepted principles of conduct. These guidelines reflect DMA's long-standing policy of high levels of ethics and the responsibility of the Association, its members, and all marketers to maintain consumer and community relationships that are based on fair and ethical principles.  In addition to providing general guidance to the industry, the Guidelines for Ethical Business Practice are used by DMA's Committee on Ethical Business Practice, an industry peer review committee, as the standard to which direct marketing promotions that are the subject of complaint to DMA are compared.

These self-regulatory guidelines are intended to be honored in light of their aims and principles.  All marketers should support the guidelines in spirit and not treat their provisions as obstacles to be circumvented by legal ingenuity.

These guidelines also represent DMA's general philosophy that self-regulatory measures are preferable to governmental mandates.  Self-regulatory actions are more readily adaptable to changing techniques and economic and social conditions.  They encourage widespread use of sound business practices.

Because dishonest, misleading or offensive communications discredit all means of advertising and marketing, including direct marketing, observance of these guidelines by all concerned is expected.  All persons involved in direct marketing should take reasonable steps to encourage other industry members to follow these guidelines as well.

Revised May 2011

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

# DMA Member Principles

DMA Member Principles are the underlying framework for the Guidelines for Ethical Business Practice as detailed herein, and for Guidelines that will be drafted in the future. These Principles apply to DMA members' relationships with current and prospective customers, donors, and members, and are the grounding for all DMA members, which includes those who market directly not only to consumers, but also to businesses, government agencies, and "SOHO" (small-office/home-office) entities. The Principles provide a general statement to the public of the expectations they can have when dealing with DMA members.

A DMA Member:

1. Is committed to customer satisfaction, good corporate citizenship, and responsible environmental, community and financial stewardship
2. Clearly, honestly, and accurately represents its products, services, terms and conditions
3. Delivers its products and services as represented
4. Communicates in a respectful and courteous manner
5. Responds to inquiries and complaints in a constructive, timely way
6. Maintains appropriate security policies and practices to safeguard information
7. Provides information on its policies about the transfer of personally identifiable information for marketing purposes
8. Honors requests not to have personally identifiable information transferred for marketing purposes
9. Honors requests not to receive future solicitations from its organization
10. Follows the spirit and letter of the law as well as DMA's Guidelines for Ethical Business Practice

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

# Table of Contents

About the DMA Guidelines .................................................................................2
DMA Member Principles.....................................................................................3


*The Terms of the Offer*
Honesty and Clarity of Offer - Article #1 .........................................................7
Accuracy and Consistency - Article #2...............................................................7
Clarity of Representations - Article #3 ...............................................................7
Actual Conditions - Article #4 ...........................................................................7
Disparagement - Article #5 .................................................................................7
Decency - Article #6 ...........................................................................................7
Photographs and Artwork - Article #7 ................................................................7
Disclosure of Sponsor and Intent - Article #8.....................................................8
Accessibility - Article #9 ....................................................................................8
Solicitation in the Guise of an Invoice or
Governmental Notification - Article #10 .............................................................8
Postage, Shipping, or Handling - Article #11 ......................................................8


*Advance Consent/Negative Option Marketing*
Article #12…………………………………………………….. .....................................8 - 10


*Marketing to Children*
Marketing to Children - Article #13....................................................................11
Parental Responsibility and Choice - Article #14................................................11
Information from or about Children - Article #15 ................................................11
Marketing Online to Children
Under 13 Years of Age - Article #16....................................................................11 - 12


*Special Offers and Claims*
Use of the Word "Free" and Other Similar
Representations - Article #17...............................................................................13
Price Comparisons - Article #18 .........................................................................13
Guarantees - Article #19 .....................................................................................13
Use of Test or Survey Data - Article #20 .............................................................13
Testimonials and Endorsements - Article #21 .....................................................14


*Sweepstakes*
Use of the Term "Sweepstakes" - Article #22.......................................................15
No Purchase Option - Article #23 ........................................................................15
Chances of Winning - Article #24........................................................................15
Prizes - Article #25..............................................................................................15
Premiums - Article #26 .......................................................................................16
Disclosure of Rules - Article #27.........................................................................16

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

*Fulfillment*

Unordered Merchandise or Service - Article #28 ................................................... 17
Product Availability and Shipment - Article #29 ................................................... 17
Dry Testing - Article #30 ....................................................................................... 17

*Collection, Use, and Maintenance of Marketing Data*

Collection, Use, and Transfer of Personally
Identifiable Data - Article #31 ......................................................................... 18 - 19
Personal Data - Article #32 .................................................................................... 20
Collection, Use, and Transfer of Health Related Data - Article #33 ..................... 20 - 21
Promotion of Marketing Lists - Article #34 .......................................................... 22
Marketing List Usage - Article #35 ....................................................................... 22
Responsibilities of Database Compilers – Article #36 .......................................... 22 - 23
Information Security - Article #37 .......................................................................... 23

*Digital Marketing*

Online Information & OBA Article #38……………… ....................................... 24 - 28
Email Solicitations Delivered to Wireless
Devices – Article #39……………………………………………………………...... 28
Commercial Solicitations Online - Article #40…………................................. 28 - 29
E-Mail Authentication – Article #41……………………………………................ 29
Use of Software or Other Similar Technology Installed on a Computer or
    Similar Device – Article #42…............................................................ 29 - 30
Social & Online Referral Marketing - Article #43……………............................ 30 - 32
E-Mail Appending to Consumer Records - Article #44……............................... 33

*Telephone Marketing to Landline & Wireless Devices*

Reasonable Hours - Article #45……………………………………………............. 34
Taping of Conversations - Article #46………………………............................... 34
Restricted Contacts - Article #47……………………………................................. 34
Caller-ID/Automatic Number Identification Requirements – Article #48 ............... 35
Use of Automated Dialing Equipment - Article #49………............................... 35 - 36
Use of Prerecorded Voice Messaging - Article #50……….............................. 36 - 37
Use of Telephone Facsimile Machines - Article #51……................................. 37 - 38
Promotions for Response by Toll-Free and Pay-Per-Call Numbers - Article #52 .... 38
Disclosure and Tactics - Article #53……………………………… .................... 38

*Mobile Marketing*

Obtaining Consent to Contact a Mobile Device – Article #54 ............................... 39
Providing Notice about Mobile Marketing Practices – Article #55 ....................... 39
Mobile Opt-Out Requests – Article #56…………………………........................ 39
Sponsorship or Affiliate Marketing – Article #57……………............................. 39
Location-Based Mobile Services – Article #58……………............................... 39 - 40
Mobile Subscription & Premium Rate Services – Article #59 .............................. 40 - 42

*Fundraising*
Article #60……………………………………….…………….. ......................42


*Laws, Codes, and Regulations*
Article #61……………………………………….......... ........................42


*Other DMA Resources*……………………………….......................43


*About DMA's  Department of Corporate & Social Responsibility*… .....................44

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

# The Terms of the Offer

**HONESTY AND CLARITY OF OFFER**

*Article #1*

All offers should be clear, honest, and complete so that the consumer may know the exact nature of what is being offered, the price, the terms of payment (including all extra charges) and the commitment involved in the placing of an order. Before publication of an offer, marketers should be prepared to substantiate any claims or offers made. Advertisements or specific claims that are untrue, misleading, deceptive, or fraudulent should not be used.

**ACCURACY AND CONSISTENCY**

*Article #2*

Simple and consistent statements or representations of all the essential points of the offer should appear in the promotional material. The overall impression of an offer should not be contradicted by individual statements, representations, or disclaimers.

**CLARITY OF REPRESENTATIONS**

*Article #3*

Representations which, by their size, placement, duration, or other characteristics are unlikely to be noticed or are difficult to understand should not be used if they are material to the offer.

**ACTUAL CONDITIONS**

*Article #4*

All descriptions, promises, and claims of limitation should be in accordance with actual conditions, situations, and circumstances existing at the time of the promotion.

**DISPARAGEMENT**

*Article #5*

Disparagement of any person or group on grounds addressed by federal or state laws that prohibit discrimination is unacceptable.

**DECENCY**

*Article #6*

Solicitations should not be sent to consumers who have indicated to the marketer that they consider those solicitations to be vulgar, immoral, profane, pornographic, or offensive in any way and who do not want to receive them.

**PHOTOGRAPHS AND ART WORK**

*Article #7*

Photographs, illustrations, artwork, and the situations they describe should be accurate portrayals and current reproductions of the products, services, or other subjects they represent.

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

**DISCLOSURE OF SPONSOR AND INTENT**

*Article #8*

All marketing contacts should disclose the name of the sponsor and each purpose of the contact.  No one should make offers or solicitations in the guise of one purpose when the intent is a different purpose regardless of the marketing channel used.

**ACCESSIBILITY**

*Article #9*

Every offer should clearly identify the marketer's name and street address or telephone number, or both, at which the individual may obtain service and exercise their marketing preferences.  If an offer is made online, the marketer should provide its name, an Internet-based contact mechanism, and a street address. For e-mail solicitations, marketers should comply with Article #40 (Commercial Solicitations Online). For mobile marketing solicitations, marketers should comply with Articles #54-56 to provide adequate notice to consumers to allow them to exercise their marketing preferences.

**SOLICITATION IN THE GUISE OF AN INVOICE OR GOVERNMENTAL NOTIFICATION**

*Article #10*

Offers that are likely to be mistaken for bills, invoices, or notices from public utilities or governmental agencies should not be used.

**POSTAGE, SHIPPING, OR HANDLING CHARGES**

*Article #11*

Postage, shipping, or handling charges, if any, should bear a reasonable relationship to actual costs incurred.

**ADVANCE CONSENT/NEGATIVE OPTION MARKETING**

*Article #12*

These guidelines apply to all media and address marketing plans where the consumer gives consent to receive and pay for goods or services in the future on a continuing or periodic basis, unless and until the consumer cancels the plan.

The following should apply to all advance consent or negative option marketing plans:

1. Initial Offer:

   CONSENT:
   Regardless of channel, marketers should have the consumer's express informed consent to participate in any advance consent or negative option marketing plan before the consumer is billed or charged. For example, a pre-checked box without further action, such as clicking a response button or sending back a response to confirm individual consent is not sufficient. In telephone sales where the consumer agrees to the offer in a way other than by credit or debit card payment, the consumer consent must be written or audio recorded.

   - Marketers should inform consumers in the initial offer of their right to cancel their participation in the plan
   - and any outstanding fees that may be owed.
   - Marketers should inform consumers in the initial offer of the length of any trial period, including a
   - statement that the consumer's account will be charged after the trial period (including the date of the charge) unless the consumer takes an affirmative step to cancel, providing the consumer a reasonable time period to cancel, and the steps needed to avoid charges.

8

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

MATERIAL TERMS & CONDITIONS:

Regardless of channel, marketers should clearly and conspicuously disclose all material terms and conditions before obtaining the consumer's billing information, including:

- A description of the goods or services being offered
- The identity of the marketer and contact information for service or cancellation
- The interval between shipments or services to be provided
- The price or the range of prices of the goods or services purchased by the consumer, including whether there are any additional charges should be disclosed
- Whether the consumer will be billed or automatically charged
- When and how frequently the consumer will be billed or charged
- Any terms with regards to a "free to keep" incentive as applicable
- The fact that the consumer must take affirmative action to cancel in order to avoid future billing or charges
- The specific and easy steps that consumers should follow to cancel the plan and to stop recurring charges from being placed on the consumer's account, and
- The time period within which the consumer must cancel.

When applicable, the following terms and conditions should also be clearly and conspicuously disclosed in the initial offer:

- That the current plan or renewal prices of the goods or services are subject to change
- The length of any free, trial or approval period in time or quantity
- The length of membership period, and the length of subsequent renewal or billing periods
- The fact that goods or services will continue after the free period unless the consumer cancels
- Any minimum purchase obligations, and
- The terms and conditions of any refund policy

In instances where the marketer uses pre-acquired account information under a free-to-pay conversion plan, the marketer should:

- Obtain from the consumer the complete account number to be charged within the appropriate data security protocols (such as PCI compliance)
- Obtain affirmative consent from the consumer to charge such account, and
- Provide channel specific proof (an email or hard copy confirmation, or if via telephone, audio record the entire transaction.)

In instances where the marketer uses pre-acquired account information but does not engage in a free-to-pay conversion plan, the marketer should:

- Identify with specificity the account that will be charged, and
- Obtain affirmative consent from the consumer to charge such account

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

2.  Providing the Goods & Services to the Consumer:
   - Marketers may provide products or services and bills concurrently; however, consumers should not be obligated to pay bills prior to the expiration of any trial period.
   - Marketers should inform consumers in renewal reminders of their right to cancel their participation in the plan, and any outstanding fees owed.
   - Marketers should provide renewal reminders at the frequency specified in the initial offer.

3.  Cancellation:
   - Marketers should promptly honor requests for refunds due upon consumers' cancellation of the plan.
   - Marketers should allow consumers a reasonable length of time between receipt of renewal reminders and the renewal date, after which consumers can cancel the plan.
   - Marketers should honor the time period they provided for a cancellation and should honor a cancellation after the expiration of the trial period.

4.  For Internet Sales:

   The initial merchant must never disclose a credit card, debit card or other financial account number or other billing information that is used to charge the customer of the initial merchant to any post-transaction third party seller for use in an Internet-based sale of any goods or services from that post-transaction third party seller.

Post Transaction Third Party Sales:

For post-transaction third party sellers:
No charges should apply to a consumer's account before obtaining the consumer's billing information as follows:

The third party seller has first clearly and conspicuously disclosed to the purchaser a description of the goods and services being offered and all material terms of the offer including:
   - The fact that the third party seller is not affiliated with the initial merchant;
   - The costs of such goods or services;
   - And the consumer has provided express informed consent for the charges by providing the complete account information to be charged, providing the consumer's name and address and a means to contact the consumer, and providing confirmation such as clicking a confirmation button or otherwise demonstrating consent to the charges.

All marketing partners or service providers should comply with these guidelines.

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

# Marketing to Children

**MARKETING TO CHILDREN**
*Article #13*

Offers and the manner in which they are presented that are suitable for adults only should not be made to children.  In determining the suitability of a communication with children online, via wireless devices such as a mobile phone or in any other medium, marketers should predetermine whether the use of the child's data for marketing purposes or the sending of marketing material to the child is permitted under federal law, such as the Children's Online Privacy Protection Act (COPPA), or state law. Where marketing to children is permitted by law, marketers should ensure the marketing is suitable for the child taking into account the age range, knowledge, sophistication, and maturity of their intended audience.

**PARENTAL RESPONSIBILITY AND CHOICE**
*Article #14*

Marketers should provide notice and an opportunity to opt out of the marketing process so that parents have the ability to limit the collection, use, and disclosure of their children's names, addresses, or other personally identifiable information.

**INFORMATION FROM OR ABOUT CHILDREN**
*Article #15*

Marketers should take into account the age range, knowledge, sophistication, and maturity of children when collecting information from them.  Marketers should limit the collection, use, and dissemination of information collected from or about children to information required for the promotion, sale, and delivery of goods and services, provision of customer services, conducting market research, and engaging in other appropriate marketing activities.

Marketers should effectively explain that the information is being requested for marketing purposes.  Information not appropriate for marketing purposes should not be collected.

Upon request from a parent, marketers should promptly provide the source and general nature of information maintained about a child.  Marketers should implement strict security measures to ensure against unauthorized access, alteration, or dissemination of the data collected from or about children, and should provide information regarding such measures upon request to the parent or guardian of the minor.

**MARKETING ONLINE TO CHILDREN UNDER 13 YEARS OF AGE**
*Article #16*

Marketers should not knowingly collect personally identifiable information online or via wireless handsets or devices from a child under 13 without prior parental consent or direct parental notification of the nature and intended use of such information, and shall provide an opportunity for the parent to prevent such use and participation in the activity.  Online and wireless/mobile contact information should only be used to directly respond to an activity initiated by a child and not to recontact a child for other purposes without prior parental consent.  However, a marketer may contact and get information from a child for the purpose of obtaining parental consent.

Marketers should not knowingly collect, without prior parental consent, personally identifiable information online or via a wireless handset or device from children that would permit any offline contact with the child.

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

Marketers should not knowingly distribute to third parties, without prior parental consent, information collected from a child that would permit any contact with that child.

Marketers should take reasonable steps to prevent the online publication or posting of information that would allow a third party to contact a child offline unless the marketer has prior parental consent.

Marketers should not entice a child to divulge personally identifiable information by the prospect of a special game, prize, or other offer.

Marketers should not make a child's access to website or mobile content contingent on the collection of personally identifiable information.  Only online contact information used to enhance the interactivity of the site is permitted.

The following assumptions underlie these online guidelines:
- When a marketer directs a site at a certain age group, it can expect that the visitors to that site are in that age range, and
- When a marketer asks the age of the child, the marketer can assume the answer to be truthful.

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

# Special Offers and Claims

**USE OF THE WORD "FREE" AND OTHER SIMILAR REPRESENTATIONS**
*Article #17*

A product or service that is offered without cost or obligation to the recipient may be unqualifiedly described as "free."

If a product or service is offered as "free," all qualifications and conditions should be clearly and conspicuously disclosed, in close conjunction with the use of the term "free" or other similar phrase.  When the term "free" or other similar representations are made (for example, 2-for-1, half-price, or 1-cent offers), the product or service required to be purchased should not have been increased in price or decreased in quality or quantity.

**PRICE COMPARISONS**
*Article #18*

Price comparisons, including those between a marketer's current price and a former, future, or suggested price, or between a marketer's price and the price of a competitor's comparable product, should be fair and accurate.

In each case of comparison to a former, manufacturer's suggested, or competitor's comparable product price, recent substantial sales should have been made at that price in the same trade area.

For comparisons with a future price, there should be a reasonable expectation that the new price will be charged in the foreseeable future.

**GUARANTEES**
*Article #19*

If a product or service is offered with a guarantee or a warranty, either the terms and conditions should be set forth in full in the promotion, or the promotion should state how the consumer may obtain a copy.  The guarantee should clearly state the name and address of the guarantor and the duration of the guarantee.

Any requests for repair, replacement, or refund under the terms of a guarantee or warranty should be honored promptly. In an unqualified offer of refund, repair, or replacement, the customer's preference should prevail.

**USE OF TEST OR SURVEY DATA**
*Article #20*

All test or survey data referred to in advertising should be valid and reliable as to source and methodology, and should support the specific claim for which it is cited.  Advertising claims should not distort test or survey results or take them out of context.

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

**TESTIMONIALS AND ENDORSEMENTS**

*Article #21*

Testimonials and endorsements in any media (including but not limited to such comments on a company's website and via social networking sites, online message boards, blogging and "word-of-mouth" marketing) should be used only if they:

    a. Are authorized by the person quoted;

    b. Are accurate, genuine and related to the experience of the person giving them, both at the time made and at the time of the promotion, and disclose the expertise of the endorser in terms of whether he or she is an expert for the purposes of the advertisement or simply a consumer endorser;

    c. Are not taken out of context so as to distort the endorser's opinion or experience with the product or service;

    d. Clearly and conspicuously disclose any material connections between the endorser and marketer, which the consumer would not expect. A material connection refers to a connection between the endorser and marketer that materially affects the weight or credibility of the endorsement, such as payments or free products, or an employer/employee relationship; and

    e. Clearly and conspicuously disclose the generally expected, or typical, results/performance of the advertised products or services, if the claims made are not typical of what a user could expect under normal circumstances.

A marketer should be able to provide prior and adequate substantiation, including providing reliable scientific evidence, as necessary, for any claims of efficacy (i.e. whether the product/service will actually do what the marketer says it will do, typicality (i.e. whether the typical consumer will have an experience like that of the endorser), and environmental benefit. The marketer should also be able to substantiate that the endorser was a bona fide user of the product at the time of the endorsement.

Additionally, marketers should ensure that their celebrity endorsers disclose their relationships with marketers when making endorsements outside the context of traditional advertisements, such as on talk shows or in social media, and they should not knowingly make statements that are false or unsubstantiated.

For purposes of this article, the terms "testimonial" and "endorsement" refer to an advertising or marketing message made in any channel that consumers are likely to believe reflects the opinions, beliefs, findings, or experiences of a party other than the sponsor of the message, even if the views expressed by that party are identical to those of the sponsor. Testimonials and endorsements can be verbal statements, demonstrations, or depictions of the name, signature, likeness or other identifying personal characteristics of an individual or the name or seal of an organization.

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

# Sweepstakes

**USE OF THE TERM "SWEEPSTAKES"**
*Article #22*

Sweepstakes are promotional devices by which items of value (prizes) are awarded to participants by chance without the promoter's requiring the participants to render something of value (consideration) to be eligible to participate.  The co-existence of all three elements -- prize, chance and consideration -- in the same promotion constitutes a lottery.  It is illegal for any private enterprise to run a lottery without specific governmental authorization.

When skill replaces chance, the promotion becomes a skill contest.  When gifts (premiums or other items of value) are given to all participants independent of the element of chance, the promotion is not a sweepstakes.  Promotions that are not sweepstakes should not be held out as such.

Only those promotional devices that satisfy the definition stated above should be called or held out to be a sweepstakes.

**NO PURCHASE OPTION**
*Article #23*

Promotions should clearly state that no purchase is required to win sweepstakes prizes.  They should not represent that those who make a purchase or otherwise render consideration with their entry will have a better chance of winning or will be eligible to win more or larger prizes than those who do not make a purchase or otherwise render consideration.  The method for entering without ordering should be easy to find, read, and understand.  When response devices used only for entering the sweepstakes are provided, they should be as easy to find as those utilized for ordering the product or service.

**CHANCES OF WINNING**
*Article #24*

No sweepstakes promotion, or any of its parts, should represent that a recipient or entrant has won a prize or that any entry stands a greater chance of winning a prize than any other entry when this is not the case.  Winners should be selected in a manner that ensures fair application of the laws of chance.

**PRIZES**
*Article #25*

Sweepstakes prizes should be advertised in a manner that is clear, honest, and complete so that the consumer may know the exact nature of what is being offered.  For prizes paid over time, the annual payment schedule and number of years should be clearly disclosed.

Photographs, illustrations, artwork, and the situations they represent should be accurate portrayals of the prizes listed in the promotion.

No award or prize should be held forth directly or by implication as having substantial monetary value if it is of nominal worth.  The value of a non-cash prize should be stated at regular retail value, whether actual cost to the sponsor is greater or less.

All prizes should be awarded and delivered without cost to the participant.  If there are certain conditions under which a prize or prizes will not be awarded, that fact should be disclosed in a manner that is easy to find, read, and understand.

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

**PREMIUMS**

*Article #26*

Premiums should be advertised in a manner that is clear, honest, and complete so that the consumer may know the exact nature of what is being offered.

A premium, gift or item should not be called or held out to be a "prize" if it is offered to every recipient of or participant in a promotion.  If all participants will receive a premium, gift, or item, that fact should be clearly disclosed.

**DISCLOSURE OF RULES**

*Article #27*

All terms and conditions of the sweepstakes, including entry procedures and rules, should be easy to find, read, and understand.  Disclosures set out in the rules section concerning no purchase option, prizes, and chances of winning should not contradict the overall impression created by the promotion.

The following should be set forth clearly in the rules:

- No purchase of the advertised product or service is required in order to win a prize
- A purchase will not improve the chances of winning
- Procedures for entry
- If applicable, disclosure that a facsimile of the entry blank or other alternate means (such as a 3"x 5" card) may be used to enter the sweepstakes
- The termination date for eligibility in the sweepstakes. The termination date should specify whether it is a date of mailing or receipt of entry deadline
- The number, retail value (of non-cash prizes), and complete description of all prizes offered, and whether cash may be awarded instead of merchandise.  If a cash prize is to be awarded by installment payments, that fact should be clearly disclosed, along with the nature and timing of the payments
- The estimated odds of winning each prize. If the odds depend upon the number of entries, the stated odds should be based on an estimate of the number of entries
- The method by which winners will be selected
- The geographic area covered by the sweepstakes and those areas in which the offer is void
- All eligibility requirements, if any
- Approximate dates when winners will be selected and notified
- Publicity rights regarding the use of winner's name
- Taxes are the responsibility of the winner
- Provision of a mailing address to allow consumers to receive a list of winners of prizes over $25.00 in value

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

# Fulfillment

**UNORDERED MERCHANDISE OR SERVICE**

*Article #28*

Merchandise or services should not be provided without having first received the customer's permission.  The exceptions are samples or gifts clearly marked as such, and merchandise mailed by a charitable organization soliciting contributions, as long as all items are sent with a clear and conspicuous statement informing the recipient of an unqualified right to treat the product as a gift and to do with it as the recipient sees fit, at no cost or obligation to the recipient.

**PRODUCT AVAILABILITY AND SHIPMENT**

*Article #29*

Direct marketers should offer merchandise only when it is on hand or when there is a reasonable expectation of its timely receipt.

Direct marketers should ship all orders according to the terms of the offer or within 30 days where there is no promised shipping date, unless otherwise directed by the consumer, and should promptly notify consumers of any delays.

**DRY TESTING**

*Article #30*

Direct marketers should engage in dry testing only when the special nature of the offer is made clear in the promotion.

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

# Collection, Use, and Maintenance of Marketing Data

For purposes of the *Guidelines for Ethical Business Practice*, the following definitions are used:

*Consumer* refers to the subject of the data.

*Marketing data* means actual or inferred information consistent with a person's commercial or charitable inquiry or transaction, or market research or market survey information. Such information can be derived from either a direct contact or marketing partnership when linked to a person's name, postal or e-mail address, or telephone number, or any other personally identifiable information. When obtained from a publicly available source, information (including public record information), not combined with other information, is not marketing data.

*Marketing purpose* means any activity undertaken to collect, aggregate, analyze, maintain, update, or sell information in order to allow or induce consumers to take action to purchase, rent, or exchange products, property or services, to solicit a charitable donation, to utilize market research or market surveys, or to provide verification services to marketers.

**PROVIDING CONSUMER CHOICE & THE COLLECTION, USE, AND TRANSFER OF PERSONALLY IDENTIFIABLE DATA**

*Article #31*
This article is applicable to all addressable media and applies to senders of marketing offers or fundraising solicitations:

**A. Providing Consumer Choice and Privacy Notice Information:**

- Marketers should provide consumers a point of contact where they may add, modify or eliminate direct marketing communications from a company or an organization and obtain the company or organization's privacy policy with regards to collection, use and transfer of their information. The point of contact information (such as a website, telephone number or address) should appear upon or within each written marketing offer, or upon request by the consumer.

- Online marketers should provide notice in accordance with Article #38.

- Email marketers should provide notice in accordance with Article #39 and the CAN-SPAM Act.
- Mobile marketers must obtain prior express consent and provide a notice in accordance with Articles #54 and #55.)
- The point of contact notice should: be easy for the consumer to find, read, understand, and act upon.
- A marketer periodically should provide existing customers with notice of its policy concerning the rental, sale, exchange, or transfer of data about them and of the opportunity to opt out of the marketing process. All such opt-out requests should be honored promptly.
- An in-house suppression request from a consumer should be interpreted as meaning that the consumer also wants to opt out of the transfer of his or her personal information
- Upon request by a consumer, a marketer should disclose the source from which it obtained personally identifiable information about that consumer.

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

**B. Processing Consumer Choices:**

- A consumer's request for elimination of future marketing offers should be processed:
    - within 30 days of the consumer's request or as required by law, whichever is the shorter time period
    - for a period of at least three years from the date of receipt of the request

- Where an affiliate, division, or subsidiary markets under a different company or brand name, and is perceived as separate by the consumer, each corporate entity or brand should separately honor requests received by it.

- A marketer should establish internal policies and practices that assure accountability for honoring consumer preference requests regardless of the marketing channel, in compliance with this guideline, and at no cost to consumers.  Should those policies substantially change, the marketer has an obligation to inform consumers of that change prior to the rental, sale, exchange, or transfer of data, and to offer consumers an opportunity to opt out of the marketing process at that time.

**C. DMAchoice and Related Consumer Choice Files:**

- For each prospecting list that is rented, sold, exchanged, or transferred, the names registered on the applicable DMAchoice (DMA's consumer choice web site) name-removal lists should be removed prior to use.

- DMAchoice name-removal lists include:
    - the relevant categorical opt-out mailing lists for Catalog, Magazine, Pre-screened Credit Offers or Other categories, as well as future categories designated by the DMA; and
    - the eMail Preference Service and Telephone Preference Service, as well as future DMA preference service lists.

- The use of the DMAchoice name-removal lists and preference service lists is not required for the company's and organization's existing customer or donor lists, only for prospects.

- Members should be listed on the DMAchoice site to demonstrate their compliance with the DMA Guidelines and to provide a direct connection to consumers for further choice requests.

    - The company or organization listed must provide the correct point of contact where the consumer may exercise their marketing preferences. (See Also Article #9 Accessibility: Every offer should clearly identify the marketer's name and street address or telephone number, or both, at which the individual may obtain service and exercise their marketing preferences.)

    In all instances, the most recent monthly release of the relevant DMAchoice file should be used.

    In addition to adhering to these guidelines, a marketer should cooperate with DMA when requested in demonstrating its compliance with the Commitment to Consumer Choice and the marketer's own consumer preference policies.

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

**PERSONAL DATA**
*Article #32*

Marketers should be sensitive to the issue of consumer privacy and should only collect, combine, rent, sell, exchange, or use marketing data.  Marketing data should be used only for marketing purposes.

Data and selection criteria that by reasonable standards may be considered sensitive and/or intimate should not be disclosed, be displayed, or provide the basis for lists made available for rental, sale or exchange when there is a reasonable expectation by the consumer that the information will be kept confidential.

Credit card numbers, checking account numbers, and debit account numbers are considered to be personal information and therefore should not be transferred, rented, sold, or exchanged when there is a reasonable expectation by the consumer that the information will be kept confidential. Because of the confidential nature of such personally identifying numbers, they should not be publicly displayed on direct marketing promotions or otherwise made public by direct marketers.

Social Security numbers are also considered to be personal information and therefore should not be transferred, rented, sold, or exchanged for use by a third party when there is a reasonable expectation by the consumer that the information will be kept confidential. Because of the confidential nature of Social Security numbers, they should not be publicly displayed on direct marketing promotions or otherwise made public by direct marketers. Social Security numbers, however, are used by direct marketers as part of the process of extending credit to consumers or for matching or verification purposes.

**COLLECTION, USE, AND TRANSFER OF HEALTH-RELATED DATA**
*Article #33*

Health-related data constitute information related to consumers':

- Illnesses or conditions
- Treatments for those illnesses or conditions, such as prescription drugs, medical procedures, devices or supplies or
- Treatments received from doctors (or other health care providers), at hospitals, at clinics, or at other medical treatment facilities

These fair information practices and principles apply to any individual or entity that collects, maintains, uses, and/or transfers health-related data for marketing purposes, whether or not marketing is a primary purpose. These principles are applicable to nonprofit as well as for-profit entities.

1. Personally identifiable health-related data gained in the context of a relationship between consumers and health or medical care providers or medical treatment facilities should not be transferred for marketing purposes without the specific prior consent of those consumers. Health or medical care providers include licensed health care practitioners, such as doctors, nurses, psychologists, pharmacists, and counselors, and those who support health care providers and therefore have access to personally identifiable information, such as insurance companies, pharmacy benefits managers or other business partners, and businesses that sell prescription drugs.

20

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

2. Personally identifiable health-related data, including the occurrence of childbirth, gained in the context of a relationship between consumers and health or medical care providers or medical treatment facilities (as defined in #1) should not be used to contact those consumers for marketing purposes without giving consumers a clear notice of the marketer's intended uses of the data and the opportunity to request not to be so contacted.

3. Personally identifiable health-related data volunteered by consumers, and gathered outside of the relationship between consumers and health care providers, should also be considered sensitive and personal in nature. Such data should not be collected, maintained, used, and/or transferred for marketing purposes unless those consumers receive, at the time the data are collected, a clear notice of the marketer's intended uses of the data, whether the marketer will transfer the data to third parties for further use, the name of the collecting organization, and the opportunity to opt out of transfer of the data. Such data include, but are not limited to, data volunteered by consumers when responding to surveys and questionnaires. Clear notice should be easy to find, read, and understand.

4. Personally identifiable health-related data inferred about consumers, and gathered outside of the relationship between consumers and health care providers, should also be considered sensitive and personal in nature. These are data based on consumers' purchasing behavior. Such data include, but are not limited to, data captured by inquiries, donations, purchases, frequent shopper programs, advertised toll-free telephone numbers, or other consumer response devices. Any entity, including a seller of over-the-counter drugs, which uses inferred health-related data should promptly provide notice and the opportunity to opt out of any transfer of the data for marketing purposes.

5. Marketers using personally identifiable health-related data should provide both the source and the nature of the information they have about that consumer, upon request of that consumer and receipt of that consumer's proper identification.

6. Consumers should not be required to release personally identifiable health-related information about themselves to be used for marketing purposes as a condition of receiving insurance coverage, treatment or information, or otherwise completing their health care-related transaction.

7. The text, appearance, and nature of solicitations directed to consumers on the basis of health-related data should take into account the sensitive nature of such data.

8. Marketers should ensure that safeguards are built into their systems to protect personally identifiable health-related data from unauthorized access, alteration, abuse, theft, or misappropriation. Employees who have access to personally identifiable health-related data should agree in advance to use those data only in an authorized manner.

9. If personally identifiable health-related data are transferred from one direct marketer to another for a marketing purpose, the transferor should arrange strict security measures to assure that unauthorized access to the data is not likely during the transfer process. Transfers of personally identifiable health-related data should not be permitted for any marketing uses that are in violation of any of DMA's *Guidelines for Ethical Business Practice*.

*Nothing in these guidelines is meant to prohibit research, marketing, or other uses of health-related data which are not personally identifiable, and which are used in the aggregate.*

21

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

## PROMOTION OF MARKETING LISTS

### Article #34

Any advertising or promotion for marketing lists being offered for rental, sale, or exchange should reflect the fact that a marketing list is an aggregate collection of marketing data.   Such promotions should also reflect a sensitivity for the consumers on those lists.

## MARKETING LIST USAGE

### Article #35

List owners, brokers, managers, and users of marketing lists should ascertain the nature of the list's intended usage for each materially different marketing use prior to rental, sale, exchange, transfer, or use of the list.  List owners, brokers, and managers should not permit the rental, sale, exchange, or transfer of their marketing lists, nor should users use any marketing lists for an offer that is in violation of these guidelines.  Mobile opt-in lists should not be rented or exchanged for the purpose of sending mobile marketing solicitations to those on the list, without obtaining prior express consent from those on the list.

## RESPONSIBILITIES OF DATABASE COMPILERS

### Article #36

For purposes of this guideline, a database compiler is a company that assembles personally identifiable information about consumers (with whom the compiler has no direct relationship) for the purpose of facilitating renting, selling, or exchanging the information to non-affiliated third party organizations for marketing purposes. Customer refers to those marketers that use the database compiler's data. Consumer refers to the subject of the data.

Database compilers should:

- Establish written (or electronic) agreements with customers that define the rights and responsibilities of the compiler and customer with respect to the use of marketing data.

- Upon a consumer's request, and within a reasonable time, suppress the consumer's information from the compiler's and/or the applicable customer's database made available to customers for prospecting.

- Not prohibit an end-user marketer from divulging the database compiler as the source of the marketer's information.

- At a minimum, explain to consumers, upon their request for source information, the nature and types of sources they use to compile marketing databases.

- Include language in their written (or electronic) agreements with DMA member customers that requires compliance with applicable laws and DMA guidelines. For non-DMA member customers they should require compliance with applicable laws and encourage compliance with DMA's guidelines.  In both instances, customers should agree before using the marketing data.

- Require customers to state the purpose for which the data will be used.

- Use marketing data only for marketing purposes. If the data are non-marketing data but are used for marketing purposes, they should be treated as marketing data for purposes of this guideline.

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

- For sensitive marketing data, compilers should review materials to be used in promotions to help ensure that their customers' use of the data is both appropriate and in accordance with their stated purpose.  Sensitive marketing data include data pertaining to children, older adults, health care or treatment, account numbers, or financial transactions.

- Randomly monitor, through seeding or other means, the use of their marketing databases to ensure that customers use them in accordance with their stated purpose.

- If a database compiler is or becomes aware that a customer is using consumer data in a way that violates the law and/or DMA's ethics guidelines, it should contact the customer and require compliance for any continued data usage, or refuse to sell the data and/or refer the matter to the DMA and/or a law enforcement agency.

## INFORMATION SECURITY
### Article #37

The protection of personally identifiable information is the responsibility of all marketers.  Therefore, marketing companies should assume the following responsibilities to provide secure transactions for consumers and to protect databases containing consumers' personally identifiable information against unauthorized access, alteration, or dissemination of data:

- Marketers should establish information security policies and practices that assure the uninterrupted security of information systems.
- Marketers should create and implement staff policies, procedures, training, and responsiveness measures to protect personally identifiable information handled in the everyday performance of duties.
- Marketers should employ and routinely reassess protective physical safeguards and technological measures, including data retention, destruction, and deletion practices, in support of information security.
- Marketers should contractually require all business partners and service providers that handle personally identifiable information to ensure that their policies, procedures, and practices maintain a level of security consistent with the marketer's applicable information security policies.
- Marketers should, in the event of a security breach where there is a reasonable likelihood of material harm to consumers, inform those consumers who may be affected as soon as reasonably practical, unless requested by legal authorities to delay such notification.

23

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

# Digital Marketing

**ONLINE INFORMATION & ONLINE BEHAVIORAL ADVERTISING**
*Article #38*
This Article addresses the collection of personally identifiable information by websites for online marketing and the collection and use of information for online behavioral advertising purposes, as defined in the Glossary of Terms.

**General Notice to Online Visitors**
If your organization operates an online site and/or is engaged in online behavioral advertising, you should make your information practices available to visitors in a prominent place on your website's home page or in a place on your website that is easily accessible from the home page. The notice about information practices on your website should be easy to find, read, and understand. Visitors should be able to comprehend the scope of the notice and how they can exercise their choices regarding use of personally identifiable information or information used for online behavioral advertising purposes.  The notice should be available prior to or at the time personally identifiable information or information used for online behavioral advertising purposes is collected.

Your organization and its postal address, and the website(s) to which the notice applies, should be identified so visitors know who is responsible for the website. You also should provide specific contact information so visitors can contact your organization for service or information.

If your organization collects personally identifiable information from visitors and/or collects information from non-affiliate websites for online behavioral advertising purposes, your notice should include:
- The nature of the information collected online for marketing purposes, and the types of uses you make of such information, including uses for online behavioral advertising purposes;
- The use(s) of such information, including whether you transfer information to third parties for use by them for their own marketing or online behavioral advertising purposes and the mechanism by which consumers can exercise choice not to have such information transferred;
- Whether personally identifiable information is collected by, used by, or transferred to agents (entities working on your behalf) as part of the business activities related to the visitor's actions on the site, including to fulfill orders or to provide information or requested services;
- Whether you use cookies or other passive means of information collection, and whether such information collected is for internal purposes or transferred to third parties for marketing purposes, including online behavioral advertising purposes;
- What procedures your organization has put in place for accountability and enforcement purposes; and
- That your organization maintains appropriate physical, electronic, and administrative safeguards to protect information collected online.

In addition, marketers should refer to Article #32 (Personal Data) specifically to assure that marketing data are used only for marketing purposes.

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

**Third-Party Notice for Online Behavioral Advertising**

When information is collected from or used on a website for online behavioral advertising purposes, visitors should be provided with notice (easy to find, read and understand) about the third party's policies for online behavioral advertising. Third parties, as defined in the Glossary of Terms, should provide notice in one of the following ways:

- through a clear, meaningful, and prominent link described in or proximate to the advertisement delivered on the Web page where information is collected;
- on DMA's approved website(s), such as DMAchoice.org or another comprehensive industry-developed website(s), that is linked from the disclosure that describes the fact that information is being collected for online behavioral advertising purposes;
- on the web page where the information is collected if there is an arrangement with the website operator for the provision of such notice;
- if agreed to by the operator of the website(s) on its web page disclosing notice and choice regarding information collected for online behavioral advertising purposes.

**Consumer Choice for Third-Party Online Behavioral Advertising**

A third party should provide consumers with the ability to exercise choice with respect to the collection and use of information for online behavioral advertising purposes or the transfer of such information to a non-affiliate for such purposes.  Such choice should be available through the notice options as detailed above.

**Material Changes to Existing Policies**

If your organization's policy changes materially with respect to the sharing of personally identifiable information with third parties including but not limited to changes for online behavioral advertising purposes, you should update your policy and give consumers conspicuous notice to that effect, offering an opportunity for individuals to select their preferences.  Prior to making a materially different use of information collected from an individual for online behavioral advertising purposes, and before notice of your organization's policy change is given, organizations should obtain informed consent to such a new marketing use from the consumer.

**Honoring Choice**

You should honor a website visitor's choice regarding use and transfer of personally identifiable information made in accordance with your stated policy.  If you have promised to honor the visitor's choice for a specific time period, and if that time period subsequently expires, then you should provide that visitor with a new notice and choice. You should provide choices online. You may also offer choice options by mail or telephone.

**Providing Access**

You should honor any representations made in your online policy notice regarding access.

**Information Security**

Your organization should maintain appropriate physical, technical and administrative safeguards and use appropriate security technologies and methods to protect information collected or used online, and to guard against unauthorized access, alteration, or dissemination of personally identifiable information during transfer and storage.  Your procedures should require that employees and agents of your organization who have access to personally identifiable information use and disclose that information only in a lawful and authorized manner.  Organizations should retain information that is collected and used for online behavioral advertising purposes only for as long as necessary to fulfill a legitimate business need, or as required by law.

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

**Visitors Under 13 Years of Age**

If your organization has a site directed to children under the age of 13 or collects personally identifiable information from visitors known to be under 13 years of age, your website should take the additional steps required by the Marketing to Children Articles of the Guidelines for Ethical Business Practice and inform visitors that your disclosures and practices are subject to compliance with the Children's Online Privacy Protection Act ("COPPA").  In addition, an organization should not engage in online behavioral advertising directed to children where it has actual knowledge that the children are under the age of 13, unless compliant with COPPA and these Guidelines.

**Health and Financial Information**

Entities should not collect and use financial account numbers, Social Security numbers, pharmaceutical prescriptions, or medical records about a specific individual for online behavioral advertising purposes without prior express consent and unless compliant with the Health Insurance Portability & Accountability Act ("HIPPA") and these Guidelines.

**Accountability**

There should be a meaningful, timely, and effective procedure through which your organization can demonstrate adherence to your stated online information practices.  Such a procedure may include: (1) self or third-party verification and monitoring, (2) complaint resolution, and (3) education and outreach.  This can be accomplished by an independent auditor, public self-certification, a third-party privacy seal program, a licensing program, and/or membership in a trade, professional or other membership association with a self-regulatory program.

**Service Provider Treatment of Online Behavioral Advertising Information**

A service provider, as defined in the Glossary of Terms, should not collect and use information for online behavioral advertising purposes without consent and should provide an easy-to-use ongoing means to withdraw consent to the collection and use of that information for online behavioral advertising purposes.

In addition, a service provider should take the following steps regarding information collected and used for online behavioral advertising purposes:

1. Alter, anonymize, or randomize (e.g., through "hashing" or substantial redaction) any personally identifiable information or unique identifier in order to prevent the information from being reconstructed into its original form in the ordinary course of business.

2. Disclose in the notice described above the circumstances in which information is collected and used for online behavioral advertising purposes.

3. Take reasonable steps to protect the non-identifiable nature of information if and when it is distributed to non-affiliates, including not disclosing the algorithm or other mechanism used for anonymizing or randomizing the information, and obtaining satisfactory written assurance that such non-affiliates will not attempt to re-construct the information and will use or disclose the anonymized information only for purposes of online behavioral advertising or other uses as specified to users.  This assurance will be considered satisfied if a non-affiliate does not have any independent right to use the information for its own purposes under a written contract.

4. Take reasonable steps to ensure that any non-affiliate that receives anonymized information will itself ensure that any other non-affiliate to which such information is disclosed agrees to the restrictions and conditions set forth in this subsection.  This obligation is also considered satisfied if a non-affiliate does not have any independent right to use the data for its own purposes under a written contract.

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

*Glossary of Terms*

**Ad Delivery** – means the delivery of online advertisements or advertising-related services using ad reporting data.  Ad delivery does not include the collection and use of ad reporting data when such data are used to deliver advertisements to a computer or device based on the preferences or interests inferred from information collected over time and across non-affiliate sites because this type of collection and use is covered by the definition of online behavioral advertising.

**Ad Reporting** – refers to the logging of page views on a website(s) or the collection or use of other information about a browser, operating system, domain name, clickstream within a site, date and time of the viewing of the Web page or advertisement, and related information for purposes including but not limited to: statistical reporting in connection with the activity on a website(s); Web analytics and analysis for improved marketing and better site design; and logging the number and type of advertisements served on a particular website(s).

**Affiliate** – refers to an entity that controls, is controlled by, or is under common control with, another entity.

**Consent** – means an individual's action in response to a clear, meaningful and prominent notice regarding the collection and use of data for online behavioral advertising purposes.  Informed consent is based on information provided to an individual that allows them to select their preferences, prior express consent means consent required from an individual prior to any marketing communication from the marketer or others.

**Contextual Advertising** – Advertising based on a consumer's current visit to a Web page or search query.  Online behavioral advertising, as defined in this Article's Glossary of Terms, does not include contextual advertising.

**Control** – of an entity means that one entity (1) is under significant common ownership or operational control of the other entity, or (2) has the power to exercise a controlling influence over the management or policies of the other entity.  In addition, for an entity to be under the control of another entity and thus be treated as a first party under these principles, the entity must adhere to online behavioral advertising policies that are not materially inconsistent with the other entity's policies.

**First Party** – is the entity that is the owner of the website, or those of its affiliates, and has control over the website with which the consumer interacts.

**Online Behavioral Advertising** – means the collection of information from a particular computer or device regarding Web viewing behaviors over time and across non-affiliate websites for the purpose of using such information to predict user preferences or interests to deliver advertising to that computer or device based on the preferences or interests inferred from such Web viewing behaviors. Online behavioral advertising does not include the activities of first parties, ad delivery or ad reporting, or contextual advertising (i.e. advertising based on the content of the Web page being visited, a consumer's current visit to a Web page, or a search query).  The activities of search engines fall within the scope of online behavioral advertising to the extent that they include collection of data regarding Web viewing behaviors over time and across non-affiliate websites in order to deliver advertising to that computer or device based on the preferences or interests inferred from such Web viewing behaviors.

**Personally Identifiable Information & Non-Personally Identifiable Information** – for purposes of this Article, personally identifiable information refers to name, address, or other information that identifies a specific individual; non-personally identifiable information (non-PII) refers to information, such as a computer's IP address, that does not

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

tie the information to a specific individual. Non-personally identifiable information collected by third parties from websites for online behavioral advertising should be combined with personally identifiable information collected about an individual for marketing purposes only with that individual's consent, unless the individual was provided with notice and choice with respect to such potential combination at the time the non-personally identifiable information was collected and did not opt out.

**Service Provider** – refers to an organization that collects and uses information from all or substantially all URLs traversed by a Web browser across websites for purposes of online behavioral advertising. Examples of service providers in this context are internet access service providers and providers of desktop applications software such as Web browser "tool bars."

**Third Party** – an entity is a third party to the extent that it engages in online behavioral advertising on a non-affiliate's website.

## MOBILE SERVICE COMMERCIAL MESSAGE SOLICITATIONS (MSCMs) DELIVERED TO A WIRELESS DEVICE
*Article #39*

A Mobile Service Commercial Message (MSCM) is a commercial electronic mail message that is transmitted directly to a wireless device that is utilized by a subscriber of a commercial mobile service.  Marketers sending MSCMs messages should obtain prior express consent from recipients and should abide by CAN-SPAM, the Federal Communications Commission's Wireless Email Rule, DMA Guidelines for Online & Mobile Marketing, and any additional federal and state regulations.

## COMMERCIAL SOLICITATIONS ONLINE
*Article #40*

1. DEFINITION:
   This article refers to addressable commercial solicitations initiated online by marketers (or their affiliates); including commercial solicitations sent to an individual's email address or another "direct contact point."  For purposes of this article, a "direct contact point" is defined as a user ID or other unique identifier at which an individual can be communicated with online or via a mobile Internet device.  This may include, for example, a text message number, personalized activity feed identifier (e.g., "twitter" ID), or user ID for postings on or to a personal social network profile page.

   Nothing in this Article or definition is meant to restrict or prohibit the use of aggregated or anonymized data pertaining to direct contact points, the use of profile data for online behavioral advertising (OBA,) or online banner advertising.

2. CHANNEL APPROPRIATE CONSENT:
   Marketers (or their affiliates) may initiate commercial solicitations online to customers or prospects under the following circumstances
   - individuals have given their channel-appropriate consent to the marketer (including, but not limited to, through the terms of a social media platform) to receive solicitations online, or

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

- Individuals did not opt out after the marketer has given notice of the opportunity to opt out from receiving solicitations online, or
- The marketer has received assurance from the third party list provider that the individuals whose e-mail addresses or other direct contact points appear on that list:
  - have given their channel-appropriate consent to receive solicitations online, or
  - have already received notice of the opportunity to opt out from receiving online solicitations and have not opted out, and DMA's E-Mail Preference Service (E-MPS) suppression file was used by the third party.

3. CHANNEL APPROPRIATE CHOICE:

Marketers should furnish individuals with the appropriate notice or a point of contact and an Internet-based mechanism individuals can use to:

- Request that the marketer not send them future online solicitations and
- Request that the marketer not rent, sell, or exchange their e-mail addresses or other direct contact point data for online solicitation purposes.

If individuals request that they be added to the marketer's in-house suppression list, then the marketer may not rent, sell, or exchange their e-mail addresses or other direct contact point data with third parties for solicitation purposes.

The above requests should be honored within 10 business days, and the marketer's opt-out mechanism should be active for at least 30 days from the date of the solicitation.

Marketers that rent, sell, or exchange personally identifiable information need to provide individuals with notice of a mechanism to opt out of personally identifiable information transfer to third-party marketers.

Solicitations sent via e-mail should disclose the marketer's identity and street address. The subject and "from" lines should be clear, honest, and not misleading, and the subject line should reflect the actual content of the message so that recipients understand that the e-mail is an advertisement. The header information should be accurate.

A marketer should also provide specific contact information at which the individual can obtain service or information.

## E-MAIL AUTHENTICATION
*Article #41*
Marketers that use e-mail for communication and transaction purposes should adopt and use identification and authentication protocols.

## USE OF SOFTWARE OR OTHER SIMILAR TECHNOLOGY INSTALLED ON A COMPUTER OR SIMILAR DEVICE
*Article #42*
Marketers should not install, have installed, or use, software or other similar technology on a computer or similar device that initiates deceptive practices or interferes with a user's expectation of the functionality of the computer and its programs. Such practices include, but are not limited to, software or other similar technology that:

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

- Takes control of a computer (e.g., relaying spam and viruses, modem hijacking, denial of service attacks, or endless loop pop-up advertisements)
- Deceptively modifies or deceptively disables security or browser settings or
- Prevents the user's efforts to disable or uninstall the software or other similar technology

Anyone that offers software or other similar technology that is installed on a computer or similar device for marketing purposes should:

- Give the computer user clear and conspicuous notice and choice at the point of joining a service or before the software or other similar technology begins operating on the user's computer, including notice of significant effects* of having the software or other similar technology installed
- Give the user an easy means to uninstall the software or other similar technology and/or disable all functionality
- Give an easily accessible link to your privacy policy and
- Give clear identification of the software or other similar technology's name and company information, and the ability for the user to contact that company

* Determination of whether there are significant effects includes, for example:
- Whether pop-up advertisements appear that are unexpected by the consumer
- Whether there are changes to the computer's home page or tool bar
- Whether there are any changes to settings in security software, such as a firewall, to permit the software to communicate with the marketer or the company deploying the software, or
- Whether there are any other operational results that would inhibit the user's expected functionality

Cookies or other passive means of data collection, including Web beacons, are not governed by this Guideline. Article #38 provides guidance regarding cookies and other passive means of data collection.

**SOCIAL MEDIA & ONLINE REFERRAL MARKETING**
*Article #43*
  1. DEFINITION
     Social media marketing is the use of online communities and/or social networks (via services, websites or platforms – each a "channel") to send a commercial marketing message to an individual and/or to that individual's own network. (Social media involves user interactions which the individual has agreed to display and to be shared.) Online referral marketing is a technique marketers use to generate new marketing leads.

     Typically, the online marketer encourages an individual to do the following:
     1. Forward a commercial solicitation  to another individual, or
     2. Provide the marketer with personally identifiable information, such as name and/or address/email address, about the referred individual so the marketer may contact that person directly, or
     3. Share or display a social ad and/or otherwise engage with a social media network or channel by, for example, "friending" (an invitation to establish a social media relationship), posting or otherwise sharing or displaying the ad on or via a social media channel (e.g., an activity feed such as tweeting). This interaction may involve a request from the marketer that the individual provide profile or social data about himself/herself or others in his/her network.  Profile data may include, but is not limited to: name, age, gender, location, expressed personal interests and preferences, and photos. Profile data also extends to what is known as the "social graph," which are explicit online connections and interactions between individuals ("friends").

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

2.  USING INFORMATION PROVIDED BY THE INDIVIDUAL AND/OR ABOUT OTHERS

If personally identifiable information about an individual is given to a marketer through social media channels and/or online referral marketing rather than directly from an individual, then the following steps should be taken:

A marketer should not use personally identifiable information about a referred individual provided online by another individual unless:

- The marketer has previously disclosed, in a clear and conspicuous manner, to the referring individual the intended uses of the information (Note: All notices and disclosures referenced in this article should be made in clear and conspicuous manner and in keeping with DMA's Ethical Guidelines.);

- The marketer has disclosed to the referring individual that his or her own contact information will be provided to those individuals they have referred to the marketer;

- The marketer discloses to the referred person the fact that his or her contact information was obtained from another individual.  The marketer should make the referring person's contact information available in the first communication to the prospect; and

- The marketer provides channel appropriate choices to the referred individual regarding receiving future communications. (Note: The frequency and type of choice provided (e.g., first communication vs. every communication) must be appropriate for the channel being used to contact the individual. For example, email communications must include an opt-out notice and choice in every communication.)

Since marketers have not had a direct contact with the referred individual, marketers should not contact referred individuals who are on their in-house suppression lists.

Marketers should not sell, rent, share, transfer, or exchange a referred e-mail address or referred personally identifiable information unless they receive prior permission from each referred person to do so.

Prior express consent must be obtained before initiating contact using a marketing channel or platform for which a referred individual will incur a fee for receipt of the marketing message, such as premium-rate text messaging via a mobile device. (Articles #54-#58.)  In addition, online referral marketers offering an incentive should adhere to Article #39 (Mobile Service Commercial Messages).

4.  SENDING COMMERCIAL SOLICITATIONS VIA INDIVIDUALS' SOCIAL MEDIA NETWORKS

If a marketer is contacting an individual to send marketing messages to that individual's network of contacts, each of the following steps should be taken:

- A marketer should obtain an individual's prior consent to participate in the social media marketing process whereby the marketer is added as a "friend" or a contact to be shared with the individual's other social media contacts;

- Profile data that contains personally identifiable information provided by an individual on a social networking site should not be shared with third parties without that individual's prior consent unless the user has agreed to post or populate such information in an unrestricted publicly accessible location;

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

- If tracking data is being collected as part of the social media marketing process for purposes of online behavioral advertising, please refer to Article #38;

- If a social or interactive advertising application (incorporating user-generated content or user interactions that the individual has consented to being shared) is being distributed to the individual's contacts, a preview should be provided to that individual for review and approval before it is distributed by the marketer to that individual's contacts. The recipient of the ad should be provided with an opportunity to opt out of receiving future communications from the marketer and having his/her information shared; and

- Marketers should not retain personally identifiable information used for social marketing purposes except for marketing purposes, and should not share such data with any third party without the individual's prior consent unless the user has agreed to post or populate such information in an unrestricted publicly accessible location.

Marketers using testimonials and endorsements in any media, including but not limited to social media channels (e.g., online message boards, blogging, etc.) and "word-of-mouth" marketing, should comply with Article #21 – Testimonials & Endorsements – of these Guidelines.  Additionally, where marketing to children is permitted by law, marketers using social media channels should comply with Articles #13 - #16 of these Guidelines and ensure the marketing is suitable for the child, taking into account the age range, knowledge, sophistication, and maturity of their intended audience.

5. OPERATORS OF SOCIAL MEDIA PLATFORMS & FORUMS
In addition to complying with the aforementioned items, operators of social media networks, platforms or other social media forums should:
- Post their privacy policy in a prominent location on their site so that it is clear and conspicuous;

- Advise individual users about their privacy policies, data deletion policy and the steps users should follow to change their privacy settings, to deactivate or to delete their accounts;

- Prevent games, quizzes and other applications developed by third parties from accessing personally identifiable information from an individual user until the marketer has provided clear and conspicuous notice to the individual before accessing their information (notice must include an opportunity to refuse marketing communications associated with the application), or obtains prior consent from that user for each category of personal information accessed.

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

**E-MAIL APPENDING TO CONSUMER RECORDS**
*Article #44*

Definition of e-mail address appending: E-mail address appending is the process of adding a consumer's e-mail address to that consumer's record.  The e-mail address is obtained by matching those records from the marketer's database against a third-party database to produce a corresponding e-mail address.

A marketer should append a consumer's e-mail address to its database only when the consumer gives a marketer permission to add his or her e-mail address to the marketer's database; or

1. There is an established business relationship with that consumer either online or offline, and
2. The data used in the append process are from sources that provided notice and choice regarding the acceptance of receiving third-party e-mail offers and where the consumer did not opt out, and
3. Reasonable efforts are taken to ensure the appending of accurate e-mail addresses to the corresponding consumer records

Marketers should not send e-mails to appended e-mail addresses that are on their in-house e-mail suppression files.  Marketers should not send Mobile Service Commercial Messages (MSCMs) to appended e-mail addresses that belong to wireless handsets or devices unless the recipient has provided prior express authorization to receive such messages from the sender.  A marketer should not sell, rent, transfer, or exchange an appended e-mail address of a consumer unless it first offers notice and choice to the consumer.  All messages to an e-mail appended address should include a notice and choice to continue to communicate via e-mail.

Marketers should have in place appropriate record-keeping systems to ensure compliance with these guidelines.

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

# Telephone Marketing to Landline & Wireless Devices

**REASONABLE HOURS**

*Article #45*

Telephone contacts, whether to a landline or wireless handset or device, should be made during reasonable hours as specified by federal and state laws and regulations.

**TAPING OF CONVERSATIONS**

*Article #46*

Taping of telephone conversations by telephone marketers should only be conducted with notice to or consent of all parties, or the use of a beeping device, as required by applicable federal and state laws and regulations.

**RESTRICTED CONTACTS**

*Article #47*

A marketer should not knowingly call or send a voice solicitation message to a consumer who has an unlisted or unpublished telephone number except in instances where that specific number was provided by the consumer to that marketer for that purpose.  A marketer should maintain an in-house Do-Not-Call list and refrain from calling numbers for solicitation purposes that are on the marketer's in-house Do-Not-Call list.

A marketer should not knowingly call a wireless device, except in instances where the recipient has provided prior express consent to receive such calls from that marketer.

Prior to contacting a landline or wireless device, marketers should use applicable federal and DMA Wireless Suppression Files or another comprehensive wireless suppression service.  Such suppression files should assist marketers in determining whether or not they are contacting a wireless device, including landline numbers that have been ported to wireless handsets or devices.

A marketer should use DMA's Telephone Preference Service as required in Article #31 and must use the federal Do-Not-Call registry and state Do-Not-Call lists when applicable prior to using any outbound calling list.Telemarketing calls may be made to landline telephones, where the telemarketer has an established business relationship with the individuals even if the individual is on the national registry.  An established business relationship is defined as those persons with whom the marketer has had a transaction/received a payment within the last 18 months or those persons who have inquired about the marketer's products/services within the last 3 months. (Note: State laws may vary. DMA's website at: www.the-dma.org/government/donotcalllists.shtml attempts to provide current information on state Do-Not-Call lists.) Consumers who have provided informed, written permission to the marketer do not need to be suppressed by any Do-Not-Call list.   Individuals can add or remove themselves from company-specific Do-Not-Call lists either orally or in writing.

Marketers should not use randomly or sequentially generated numbers in sales or marketing solicitations.

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

## CALLER-ID/AUTOMATIC NUMBER IDENTIFICATION REQUIREMENTS

*Article #48*

Marketers engaging in telemarketing to landline and wireless telephone numbers should generate caller identification information, including:

- A telephone number for the seller, service bureau, or customer service department that the consumer can call back during normal business hours to ask questions and/or to request not to receive future calls by making a do-not-call request, and
- Whenever the technology is available from the marketer's telecommunications carrier, the name of the seller on whose behalf the call is placed or service bureau making the call.

Marketers should not block transmission of caller identification or transmit a false name or telephone number.

Telephone marketers using automatic number identification (ANI) should not rent, sell, transfer, or exchange, without customer consent, landline telephone numbers gained from ANI, except where a prior business relationship exists for the sale of directly related goods or services. With regard to mobile telephone numbers, marketers should abide by Articles #31 and #35.

## USE OF AUTOMATED DIALING EQUIPMENT

*Article #49*

Marketers using automated dialing equipment should allow 15 seconds or four rings before disconnecting an unanswered call.

Marketers should connect calls to live representatives within two seconds of the consumer's completed greeting (except in cases where a prerecorded marketing message is used, in accordance with Article #55).  If the connection does not occur within the two-second period, then the call is considered abandoned whether or not the call is eventually connected.
For any abandoned calls, the marketer should play a prerecorded identification message that includes the seller's name and telephone number, states the purpose of the call, and provides a telephone number at which the consumer can request not to receive future marketing calls.
Repeated abandoned or "hang up" calls to consumers' residential telephone numbers should be minimized.  In no case should calls be abandoned more than:

- Three percent of answered calls, measured over the duration of a single calling campaign, if the campaign is less than 30 days, or separately over each successive 30-day period or portion of that period during which the campaign continues (unless a more restrictive state law applies), or
- Twice to the same telephone number within a 48-hour time period.

Marketers should only use automated dialing equipment that allows the telephone to immediately release the line when the called party terminates the connection.

When using any automated dialing equipment to reach a multi-line location, whether for business-to-consumer or business-to-business marketing, the equipment should release each line used before connecting to another.

Companies that manufacture and/or sell automated dialing equipment should design the software with the goal of minimizing abandoned calls to consumers.  The software should be delivered to the user set as close to 0% as possible. Manufacturers should distribute these Guidelines for Automated Dialing Equipment to purchasers of dialing equipment and recommend that they be followed.

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

The dialers' software should be capable of generating a report that permits the user of the equipment to substantiate compliance with the guideline.

*Glossary of Terms Used*

**Automated Dialing Equipment** – any system or device that initiates outgoing call attempts from a predetermined list of phone numbers, based on a computerized pacing algorithm.

**Abandoned Call** – a call placed by automated dialing equipment to a consumer which when answered by the consumer, (1) breaks the connection because no live agent is available to speak to the consumer, or (2) no live agent is available to speak to the consumer within 2 seconds of the consumer's completed greeting.

**Abandonment Rate** – the number of abandoned calls over a 30-day period divided by the total number of calls that are answered by a live consumer. Calls that are not answered by a live consumer do not count in the calculation of the abandonment rate.

**Campaign** – refers to an offer of the same good or service for the same seller. As long as the same good or service is being offered by the same seller, the offer is part of a single campaign, regardless of whether there are changes in the terms of the offer or the wording of any marketing material, including any telemarketing script, used to convey the offer. This definition applies to Article 48 only and is based on the FTC's definition of a "campaign" for purposes of calculating the abandonment rate.

**Report** – reportable information that should be made available which contains key points, including the percentage of abandoned calls.

**Telemarketing** – a telephone call, prerecorded message or text message placed to a landline or wireless number for the purpose of promoting, advertising, marketing or offering goods or services.

## USE OF PRERECORDED VOICE MESSAGING
*Article #50*

Marketers who use prerecorded voice messaging should not automatically terminate calls or provide misleading or inaccurate information when a live consumer answers the telephone.

Marketers should only use prerecorded voice messaging to sell good or services if they have first obtained the call recipient's prior express written agreement to receive prerecorded messages. In obtaining the consumer's written agreement, a marketer should observe the following:

- Before obtaining the consumer's informed consent, the marketer should clearly and conspicuously disclose that the purpose of the agreement is to allow the marketer to make prerecorded message calls to the consumer.
- The written agreement should evidence the consumer's informed consent to receive prerecorded calls by or on behalf of the specific marketer
- The marketer should not require that the consumer agree to receive prerecorded calls as a condition of purchasing any good or service.
- The agreement should include the consumer's telephone number and signature.
- Marketers may obtain the written agreement electronically in accordance with applicable laws such as the E-Sign Act.

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

Marketers should begin making the initial disclosures as specified under Article #52 within two seconds of the call recipient's completed greeting.

Immediately following the initial disclosures, marketers should provide an opt-out mechanism that the call recipient can use to be placed on the company's do-not-call list.  The type of mechanism that the marketer should provide depends on whether the call can be answered by a live person or by an automated device.  If the marketer is able to determine whether a prerecorded call has been answered by a live person or an automated device, the marketer should tailor the prerecorded message to include the appropriate opt-out mechanism (either option 1 or 2 below):

1. If the call is answered by a live person, then the marketer should provide an automated interactive voice and/or keypress-activated opt-out mechanism that the recipient can use to make an opt-out request.  The mechanism should be available for use at any time during the message.

2. If the call is answered by an answering machine or voicemail system, then the prerecorded message should provide a toll-free telephone number that the recipient can call to make an opt-out request at any time during the telemarketing campaign.  The telephone number provided should connect directly to an automated interactive voice and/or keypress-activated opt-out mechanism.  Consumers should be able to call at any time of the day, and on any day, during the duration of the campaign.

If the marketer is not able to determine whether a prerecorded call has been answered by a live person or an automated device, the prerecorded message should include both options 1 and 2.

The interactive voice and/or keypress-activated opt-out mechanism – regardless of whether the prerecorded call can be answered by a live person or automated answering device – should have the following features:

- The opt-out mechanism should automatically add the number called to the entity's company-specific do-not-call list; and
- The opt-out mechanism should immediately disconnect the call once the opt-out request is made.

Marketers may use prerecorded messages that provide information, but do not induce the purchase of goods or services, without first obtaining written consent and without providing an opt-out mechanism.  Such calls should promptly disclose the identity of the caller at the outset of the call and provide a telephone number sometime during the call.

## USE OF TELEPHONE FACSIMILE MACHINES
### *Article #51*
Unless there is an established business relationship, or unless prior permission has been granted, advertisements, offers and solicitations, whether sent to a consumer or a business, should not be transmitted to a facsimile machine, including computer fax machines.  An established business relationship in the fax context is defined as a prior or existing relationship based on a voluntary, two-way communication between the sender and recipient of the fax. Such communication includes a purchase, transaction, inquiry, or application for or about goods or services offered by the sender.  For business relationships formed after July 9, 2005, the fax number must be provided voluntarily by the recipient to the sender, or be made available voluntarily by the recipient in a directory, advertisement, or Internet site.

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

Each permitted transmission to a fax machine must clearly contain on the first page:

- the date and time the transmission is sent;
- the identity of the sender which is registered as a business with a state;
- the telephone number of the sender or the sending machine; and
- a clear and conspicuous opt-out notice.

The opt-out notice should:

- clearly state that the recipient may opt out of any future faxes and provide clear instructions for doing so;
- provide a domestic telephone number and fax number for recipients to transmit an opt-out request; and
- unless the telephone or fax number is toll-free, a cost-free mechanism to submit an opt-out request.

Senders must accept opt-out requests at any time.

Opt-out requests must be honored in 30 days, or sooner if feasible.  An opt-out request terminates permission to send future faxes based only on an established business relationship.

## PROMOTIONS FOR RESPONSE BY TOLL-FREE AND PAY-PER-CALL NUMBERS
### Article #52
Promotions for response by 800 or other toll-free numbers should be used only when there is no charge to the consumer for the call itself and when there is no transfer from a toll-free number to a pay call.
Promotions for response by using 900 numbers or any other type of pay-per-call programs should clearly and conspicuously disclose all charges for the call.  A preamble at the beginning of the 900 or other pay-per-call should include the nature of the service or program, charge per minute, and the total estimated charge for the call, as well as the name, address, and telephone number of the sponsor.  The caller should be given the option to disconnect the call at any time during the preamble without incurring any charge.  The 900 number or other pay-per-call should only use equipment that ceases accumulating time and charges immediately upon disconnection by the caller.

## DISCLOSURE AND TACTICS
### Article #53
Marketers should make the following initial disclosures promptly:

- The identity of the seller or charitable organization on behalf of which the call is made;
- That the purpose of the call is to sell goods or services or to solicit a charitable contribution;
- The nature of the goods or services offered during the call (if applicable); and
- If a prize promotion is offered, that no purchase or payment is necessary to be able to win a prize or participate in a prize promotion and that any purchase or payment will not increase the person's chances of winning.

Prior to asking consumers for payment authorization, telephone marketers should disclose the cost of the merchandise or service and all terms and conditions, including payment plans, whether or not there is a no refund or a no cancellation policy in place, limitations, and the amount or existence of any extra charges such as shipping and handling and insurance. At no time should high pressure tactics be utilized.

38

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

# Mobile Marketing

Please refer to the Glossary of Terms at the end of this section for the complete definitions of key concepts and terms used within this section.

**OBTAINING CONSENT TO CONTACT MOBILE DEVICES**
*Article #54*
Marketers should obtain prior express consent from existing and prospective customers before sending mobile marketing to a wireless device.  A marketer should be able to demonstrate that the recipients knowingly and affirmatively consented. Consent may be obtained orally, in writing or electronically.

**PROVIDING NOTICE ABOUT MOBILE MARKETING PRACTICES**
*Article #55*
Marketers that send or intend to send mobile messages should publish an easily accessible notice of their practices (which includes but is not limited to a notice in their respective privacy policies) with regard to mobile marketing.  The notice must include sufficient information to allow individuals to make an informed choice about their interaction with the marketer.  This should include, at minimum, any applicable terms and conditions, details of the marketer's information handling practices and clear directions about how to unsubscribe.

The notice should be easy to find, read and understand, and should comply with existing DMA Guidelines. Of particular note, mobile marketers should review and comply with the Terms of the Offer (Articles #1-6, #8, #9), Advance Consent Marketing (Article #12), Special Offers & Claims (Articles #17-#21), and Sweepstakes (Articles #22-#27).

**MOBILE OPT-OUT REQUESTS**
*Article #56*
Every mobile marketing message sent must include a simple and easy-to-use mechanism through which the individual can opt out of receiving future mobile marketing messages. Where possible, the opt-out mechanism provided should allow the recipient to opt out via reply text message.

Where individuals respond to a marketer indicating that they do not wish to receive future mobile marketing messages (e.g. an individual replies "STOP"), the marketer should honor the request.  Mobile opt-out requests should be honored within 10 days of being received and in accordance with Article #31.

**SPONSORSHIP OR AFFILIATE MOBILE MARKETING**
*Article #57*
A marketer may include an affiliate or sponsorship message within a mobile marketing communication, providing that the recipient has provided prior express consent to receive mobile marketing communications from that marketer and that it is clear from the mobile marketing communication that the message has been sent by that marketer and not by the sponsor. A marketer should also comply with Article #8 - Disclosure of Sponsor and Intent.

**LOCATION-BASED MOBILE MARKETING**
*Article #58*
Marketers sending location-based mobile marketing messages to recipients should adhere to  Articles #54-56.  In addition, marketers should inform individuals how location information will be used, disclosed and protected so that the individual

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

may make an informed decision about whether or not to use the service or consent to the receipt of such communications. Location-based information must not be shared with third-party marketers unless the individual has given prior express consent for the disclosure.

## MOBILE SUBSCRIPTION SERVICES AND PREMIUM-RATE MOBILE SERVICES
### *Article #59*

Mobile subscription services and mobile premium-rate products and/or services should be offered and delivered in accordance with DMA Guidelines, in particular the Terms of the Offer (Articles #1-6, #8, #9), Advance Consent Marketing (Article #12), Marketing to Children (Article #13-#16), Special Offers & Claims (Articles #17-#21) and Sweepstakes (Articles #22-#27). All advertising and marketing for mobile subscription services or premium-rate mobile products/services should clearly define the service offered and outline the terms and conditions of the offer in accordance with these articles. Mobile subscription services or premium-rate mobile services should not be supplied unless the recipient has actively requested to receive the specific service to be supplied. Further, prior express consent should be obtained from a recipient prior to supplying additional or separate mobile subscription services and premium-rate mobile services at a subsequent date.

In accordance with Articles #12 and #48, and prior to sending or charging recipients for mobile subscription services and/or premium-rate mobile products/services, marketers should:

- provide the individual with an opportunity to see or hear the terms and conditions relating to the subscription service, including:
    - the cost per unit or the total cost of the subscription or premium-rate service;
    - the term of the subscription or premium-rate service;
    - the frequency of the subscription or premium-rate service;
    - payment intervals;
    - how to terminate the subscription or premium-rate service including any terms and conditions that apply to such termination.

- obtain prior express consent from recipients to receive and be charged for said subscriptions, products and/or services;
- inform recipients in the initial offer and in renewal reminders of their right to cancel their participation in the plan, and include contact information within the initial and renewal messages that allows the recipient to directly contact them;
- provide renewal reminders at the frequency specified in the initial offer;
- promptly honor requests for refunds due upon a consumer's cancellation of the plan;
- abide by Articles #13-#16 and #48, and take reasonable precautions and implement adequate technical accountability and authentication measures to ascertain that

    - (a) the mobile phone number or email address provided indeed belongs to the intended recipient of the subscriptions, products or services, and

    - (b) periodically, and not less than once a month, include contact information within the mobile subscription service message or premium-rate mobile service message that allows the individual to directly contact the marketer.

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

*Glossary of Terms Used*

**Individuals** – refers to the recipients or potential recipients of mobile marketing communications. For purposes of opting out (refer to Article #56), individuals refers to the number(s) and/or electronic address(es) of the wireless device(s) used by the recipients.

**Location-Based Services** – marketing text message targeted to a recipient dependent on their location, by a handset or user's physical location.

**Mobile Marketing** – refers to a sales and promotion technique in which promotional materials are delivered to a wireless phone or device. It can include both 'direct mobile marketing' (i.e. marketing communications targeted, sent or "pushed" to a wireless handset or device, such as marketing text messages) and 'indirect mobile marketing' (i.e. marketing that can be accessed or "pulled" by an individual via a wireless handset or device such as a mobile enabled website). Examples include the sending of SMS, MMS or WAP push messages, Bluetooth messaging and other interrupt based marketing to wireless devices.

**Mobile Service Commercial Message (MSCM)** – a commercial electronic message that is transmitted directly to a wireless device that is utilized by a subscriber of commercial mobile service.

**Multi-Media Messaging Services (MMS)** –  an extension of a the Short Message Service Technology that permits the marketer to send marketing messages to a wireless handset that include multimedia objects such as images, audio and video.

**Mobile Subscription Service** – a service that is provided periodically or on an ongoing basis that is delivered to an individual via a wireless handset or device. This includes free services and paid subscription services.

**Premium Rate Mobile Services** – a service that is provided in a single instance, periodically or on an ongoing basis that is delivered to an individual via a wireless handset or device whereby the recipient pays a rate that exceeds the standard tariff to either receive or send a mobile message.

**Prior Express Consent** – refers to affirmative, express and informed consent. A marketer should be able to demonstrate that recipients knowingly and affirmatively consented to be contacted on their wireless devices by that marketer for any purposes.   Consent may be obtained orally, in writing or electronically. The notice to obtain consent should include a clear and conspicuous disclosure and require an active step on the part of the recipient to demonstrate that he/she agrees to receive the communication and/or product or service. This consent may be obtained via any channel. A pre-checked box, for example, would not suffice as an adequate means for obtaining consent.

**Recipient** – any natural or legal person or business that receives a mobile marketing communication.

**Short Message Service (SMS)** – a marketing message sent as a text message.

**Text message** – a brief electronic message sent between mobile phones, containing text composed by the sender, usually input via a lettering system on a cell phone's numeric keypad.

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

**Wireless Application Protocol (WAP)** – Refers to a secure specification that allows users to access information instantly via handheld wireless devices such as mobile phones, pagers, two-way radios, smartphones and communicators.

**Wireless** – Refers to telecommunications in which electromagnetic waves (rather than some form of wire) carry the signal over part or all of the communication path.

**Wireless Handset** – Umbrella term for devices, typically with keys to input data, that are mobile and can be operated by hand. Examples are mobile phones, pagers, two-way radios, smartphones and communicators.

## FUNDRAISING
*Article #60*

In addition to compliance with these guidelines, fundraisers and other charitable solicitors should, whenever requested by donors or potential donors, provide financial information regarding use of funds.

## LAWS, CODES, AND REGULATIONS
*Article #61*

Direct marketers should operate in accordance with laws and regulations of the United States Postal Service, the Federal Trade Commission, the Federal Communications Commission, the Federal Reserve Board, and other applicable federal, state, and local laws governing advertising, marketing practices, and the transaction of business.

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

# Other DMA Resources

- "Do the Right Thing" Compliance Guide
- Commitment to Consumer Choice Member Compliance Guide
- Preference Services Subscriber Information
- DMA's consumer website: **www.DMAchoice.org**
- Privacy Policy Generators
- Environmental Resources and Generator (The "Green 15")
- E-Commerce Integrity Resource Center
- Information Security: Safeguarding Personal Data in Your Care

See DMA's Resources for Businesses Guide for numerous other resources developed by the Department of Corporate & Social Responsibility: **www.dmaresponsibility.org**

DMA can also provide your company with information on the following Federal Trade Commission (FTC) and Federal Communications Commission (FCC) regulations and rules affecting direct marketers:

*FTC:*

- Mail or Telephone Order Merchandise Rule
- Telemarketing Sales Rule
- Children's Online Privacy Protection Rule
- Negative Option Rule
- Guides against Deceptive Pricing

*FCC:*

- Telephone Consumer Protection Act

The US Postal Service's *Fighting Mail Order Fraud and Theft: Best Practices for the Mail Order Industry Reference Guide* is available, as well as other DMA and government titles, and a variety of consumer education brochures.

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

# DMA's Department of Corporate & Social Responsibility

In its continuing efforts to improve and advance the practices of direct marketing and the marketer's relationship with customers, the DMA sponsors several activities through its Department of Corporate & Social Responsibility:

- Ethical Guidelines are maintained, updated periodically, and distributed to the direct marketing community.

- The Committee on Ethical Business Practice investigates and examines promotions and practices throughout the direct marketing community that are brought to its attention.

- The Ethics Policy Committee revises the Guidelines as needed, and initiates programs and projects directed toward improved ethical awareness in the direct marketing arena.

- The Committee on the Environment and Social Responsibility identifies ways for members to be good corporate citizens and recommends relevant best practices.

- "Dialogue" meetings between direct marketing professionals and consumer affairs and regulatory representatives facilitate increased communication between direct marketers and their customers.

- DMA's Commitment to Consumer Choice builds consumer trust in the marketing process by offering individual choices online and offline.

www.DMAchoice.org  offers consumers assistance in managing their mail and email marketing preferences, and provides consumer education. www.Aboutads.info provides consumers choices for online behavioral advertising. The DMA CSR department oversees compliance by marketers to ensure consumer choices are being honored.

**For additional information contact DMA's Washington Office:**

1615 L Street, NW, Suite 1100
Washington, DC 20036
202.955.5030
Fax: 202.955.0085
www.dmaresponsibility.org
E-mail: ethics@the-dma.org

**Direct Marketing Association, Inc. Headquarters:**
1120 Avenue of the Americas
New York, New York 10036-6700
212.768.7277
Fax: 212.302.6714
www.the-dma.org

26SL-CC04688

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

# EXHIBIT B

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM



# Negative Options

A Report by the staff of the FTC's
Division of Enforcement

Federal Trade Commission
January 2009

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

# Contents

**Executive Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .i

**Negative Option Marketing Workshop Report** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

**I.    Background Regarding the Types of Negative Options** . . . . . . . . . . . . . . . . . . . . . . . .2

**II.    Summary of Panels and Comments** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

    A.    Panel One:  The Benefits and Costs of Negative Option Offers . . . . . . . . . . . . . . . .3
        1.    Benefits of Negative Option Offers to Sellers . . . . . . . . . . . . . . . . . . . . . . . .3
        2.    Benefits of Negative Option Offers to Consumers . . . . . . . . . . . . . . . . . . . .4
        3.    Potential Problems with Negative Option Offers for Consumers. . . . . . . . . . .5
        4.    Panelist Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
    B.    Panel Two:  Analysis of Consumer Behavior Online . . . . . . . . . . . . . . . . . . . . . . . .6
        1.    Consumer Online Behavior. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7
        2.    Online Notices and Disclosures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8
        3.    Panelist Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9
    C.    Panel Three:  Application of the Clear and Conspicuous Standard to Online Offers
        with Negative Option Features . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10
        1.    The Clear and Conspicuous Standard and Online Research. . . . . . . . . . . . . .10
        2.    Clear and Conspicuous Negative Option Disclosures . . . . . . . . . . . . . . . . . .12
        3.    Panelist Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13
    D.    Panel Four:  Making Effective Disclosures in Negative Option Marketing Online . .14
        1.    Summary of FTC Staff's Mock Advertisement Exercise . . . . . . . . . . . . . . . .15
        2.    Summary of the Mock Advertisement Disclosures . . . . . . . . . . . . . . . . . . .15
        3.    Evaluation of the Disclosures in the Mock Advertisements . . . . . . . . . . . . . .19
        4.    Negative Option Disclosures Generally . . . . . . . . . . . . . . . . . . . . . . . . . . .23
    E.    Comments Filed in Response to Federal Register Notice  . . . . . . . . . . . . . . . . . . .25

**III.    Marketing Principles for Online Negative Option Offers** . . . . . . . . . . . . . . . . . . . . . .26

**IV.    Suggested Areas for Future Research** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

**V.    Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

**Endnotes** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

**Appendices:  Mock Advertisement Exercise** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

## Executive Summary

On January 25, 2007, the Federal Trade Commission hosted a workshop that brought together industry representatives, consumer groups, and members of the academic community to discuss negative option marketing.  The FTC uses the phrase "negative option marketing" broadly to refer to a category of commercial transactions in which sellers interpret a customer's failure to take an affirmative action, either to reject an offer or cancel an agreement, as assent to be charged for goods or services.  Negative option marketing can pose serious financial risks to consumers if appropriate disclosures are not made and consumers are billed for goods or services without their consent.  With the explosion of Internet marketing over the past ten years, negative option offers are as much a fixture of online advertising as in any other advertising media.  The workshop focused particularly on Internet-based negative option offers, because they are relatively new and present distinct issues regarding the form, content, and timing of disclosures.

There are four types of plans that fall into the negative option marketing category – prenotification negative option plans; continuity plans; automatic renewals; and free-to-pay or nominal-fee-to-pay conversion offers.  First, in prenotification negative option plans, such as book or music clubs, sellers send periodic notices offering goods.  If consumers take no action, sellers send the goods and charge consumers.  Second, in a continuity plan, consumers agree in advance to receive periodic shipments of goods or provision of services, which they continue to receive until they cancel the agreement.  Third, in an automatic renewal, a magazine seller, for example, may automatically renew a consumer's subscription when it expires and charge for it, unless the consumer cancels the subscription.  Finally, sellers also structure trial offers as free-to-pay, or nominal-fee-to-pay, conversions.  In these plans, consumers receive goods or services for free (or at a nominal fee) for a trial period.  After the trial period, sellers automatically begin charging a fee (or higher fee) unless consumers affirmatively cancel or return the goods or services.

In addition, some negative option offers include upsell or bundled offers.  An upsell occurs when a consumer completes a primary transaction and then receives a solicitation for an additional product or service.  A bundled offer occurs when a seller packages two products or services together so that they cannot be purchased separately.

At the workshop, the participants discussed the four types of negative option plans as well as upsell and bundled offers.  The workshop included four panel discussions.  The first panel discussed the benefits and drawbacks of negative option offers to both sellers and buyers.  The

i

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

second panel discussed online consumer behavior.  The third panel analyzed the FTC's "clear and conspicuous" standard in light of current research regarding online disclosures and the application of this standard to online negative option offers.  The final panel discussed online negative option disclosures using mock Internet advertisements, including negative option offers created by industry and consumer groups.  All four panels made recommendations for online negative option offers.

This report summarizes the workshop presentations and comments in response to the related Federal Register Notice.  The report also identifies five principles for marketing online negative option offers based upon recent FTC cases and the workshop panelists' comments.

During Panel One, the panelists discussed the costs and benefits of negative option offers.  Negative option offers can benefit sellers by allowing them to stock inventory more efficiently because they can ship products to consumers on a predetermined schedule.  In addition, negative options help sellers avoid costs related to renewals.  These decreased operating costs can generate increased profit.  Consumers also can benefit from negative option offers by receiving uninterrupted service, often with a greatly simplified renewal process.  In some plans, consumers can examine products before purchasing.  Because consumers must take action to cancel contracts, which they may consider burdensome, sellers may provide buyers up-front benefits, such as introductory gifts or free trials, to entice them to agree to the offer.

The panelists, however, remarked that despite their benefits, negative option plans also pose potential problems for consumers.  First, consumers lack bargaining power in these transactions because their silence constitutes acceptance of an offer and they must take action to reject future products or services.  Second, some negative option practices generate significant consumer dissatisfaction.  According to panelists, negative option plans offered as an upsell by a third-party seller – a seller distinct from the party offering the initial product – have been a source of considerable consumer dissatisfaction.  Due to inadequate disclosures, consumers may be unaware that they agreed to a second purchase; may not know the second seller; and may not have consented to the transfer of their financial account information.  To avoid consumer dissatisfaction, panelists recommended that sellers clearly disclose the existence and terms of the offer and obtain consumers' consent.

Panel Two focused on consumer online behavior.  The panelists explained that marketers seeking to make clear and conspicuous negative option disclosures face challenges in getting consumers to see and read their disclosures.  The panelists revealed that many online consumers

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

exhibit certain characteristics, including inattention, unwarranted confidence, exuberance, and a desire for immediate gratification, which make them less likely to see and read disclosures. Panelists further explained that, as result of these online characteristics, consumers become "click-happy" and quickly navigate through webpages, without paying much attention because they believe nothing will go wrong and want to complete the transaction as rapidly as possible. As a result, consumers often do not read or understand the terms of the agreements they accept. To combat consumers' exuberance and inattention, the panelists recommended using short notices that include only the information material to consumers. Panelists discouraged the use of pre-checked boxes to obtain consumer consent because online research indicates consumers ignore them. Panelists also recommended marketers use simple, clear cancellation procedures to allow consumers to cancel contracts.

During Panel Three, the panelists discussed the "clear and conspicuous" standard for making online disclosures and its application to online negative option offers. The FTC's business guidance, <u>Dot Com Disclosures:  Information about Online Advertising</u>, states that to evaluate whether a disclosure meets the standard, sellers should examine the disclosure's prominence, presentation of information, placement on the page, and proximity to the offer. Applying this guidance, panelists recommended that sellers use fonts, colors, and backgrounds that are easy to see and read. Long disclosures that require a lot of scrolling or clicking should be avoided, according to this panel. Panelists also discouraged disclosures worded in legal jargon or labeled with headings such as "More Info." Panelists noted that disclosures should be placed in a location on the webpage that consumers are likely to see. Finally, the panelists recommended that sellers consider whether they should use certain web design features, such as pop-up windows or hyperlinks, to make material disclosures. They stated that, to ensure that consumers see and read disclosures, marketers may need to place disclosures on ordering pages.

Panel Four continued the clear and conspicuous disclosure discussion using a mock advertisement created for the workshop. Two panelists, the Electronic Retailers Association and Consumer Reports WebWatch, presented advertisements for a recipe card club negative option plan. Two discussants on the panel critiqued the advertisements and provided recommendations for making effective negative option disclosures online. Both advertisements contain an early disclosure of some of the negative option terms. One disclosure, however, is shorter and more simply worded, and the discussants preferred the shorter disclosure. Both advertisements also contain additional disclosures that appear as consumers proceed through the transaction.

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

The discussants noted that some of the disclosures are in small fonts and are densely worded, minimizing the chances that consumers will see or read them.  One discussant emphasized the need to place disclosures in locations where consumers are likely to look, such as near the price and quantity information; and to use formatting, such as bullets and clear labels, to grab consumers' attention.  This discussant also recommended making disclosures early in the transaction when consumers are still considering the offer as opposed to when they are completing address and payment information at a later point.  The discussant noted that during the payment stage consumers are more focused on trying to complete the transaction than on learning about the terms of the offer.

As noted above, throughout the day, panelists provided numerous recommendations regarding online negative option disclosures.  Based on these recommendations and the Commission's recent cases, this report identifies five principles the staff developed to guide marketers in complying with Section 5 of the FTC Act when marketing online negative option offers.

1) Marketers should disclose the material terms of the offer in an understandable manner.

   The material terms of negative option offers include: the existence of the offer; the offer's total cost; the transfer of a consumer's billing information to a third party (if applicable); and how to cancel the offer.  Marketers should avoid making disclosures that are vague, unnecessarily long, or contain contradictory language.

2) Marketers should make the appearance of disclosures clear and conspicuous.

   To make online negative option disclosures clear and conspicuous marketers should place them in locations on webpages where they are likely to be seen, label the disclosures (and any links to them) to indicate the importance and relevance of the information, and use text that is easy to read on the screen.

3) Marketers should disclose the offer's material terms before consumers pay or incur a financial obligation.

   Marketers should disclose an offer's material terms before consumers agree to purchase the item.  Consumers often agree to an offer by clicking a "submit" button; therefore, disclosures should appear before consumers click that button.

iv

4) Marketers should obtain consumers' affirmative consent to the offer.

Marketers should require that consumers take an affirmative step to demonstrate consent to an online negative option offer.  Marketers should not rely on a pre-checked box as evidence of consent.

5) Marketers should not impede the effective operation of promised cancellation procedures.

Marketers should employ cancellation procedures that allow consumers to effectively cancel negative option plans.  Marketers should not engage in practices that make cancellation burdensome for consumers, such as requiring consumers to wait on hold for unreasonably long periods of time.

Following these principles will maximize the likelihood of compliance with Section 5, although whether a particular negative option offer violates Section 5 will depend on an individualized assessment of the advertisement's net impression and the marketer's business practices.

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

# Negative Option Marketing Workshop Report

On January 25, 2007, the Federal Trade Commission hosted a workshop entitled "Negative Options: A Workshop Analyzing Negative Option Marketing."[1]  The workshop brought together industry, consumer groups, and members of the academic community to discuss issues and marketing principles for businesses seeking to make negative option offers in a truthful, non-deceptive manner, particularly in the online marketplace.[2]

Negative option offers, marketed online or offline, can benefit consumers, but they also have potential pitfalls.  The problematic aspects of negative option marketing tend to fall into three broad categories:

1) failing to disclose adequately or misrepresenting the material terms of negative option offers;

2) failing to obtain consumers' express informed consent before billing or charging them; and

3) failing to provide effective means for consumers to cancel a negative option.

Internet-based negative option marketing poses unique issues.[3]  For example, webpage design affects the form, content, and timing of negative option disclosures.  Marketers must consider whether to disclose material terms on the ordering pages, in hyperlinks, or in pop-up windows.  In addition, marketers must determine the appropriate stage of the transaction to make material disclosures.  Additionally, online research suggests that people interact with webpages differently than print materials and may not read the same notices and disclosures online that they would offline.  Participants at the Negative Option Workshop discussed all these issues and more.

This report summarizes the presentations and discussions from the workshop, along with comments received in response to a related Federal Register Notice ("FRN").  Part I of this report describes the types of negative option offers.  Part II summarizes the workshop presentations and discussions as well as the comments filed in response to the FRN.  Part III sets forth marketing principles FTC staff have developed to guide online negative option marketers in complying with Section 5 of the FTC Act.  Finally, Part IV discusses issues to consider in the future, as technology evolves and consumer behavior research progresses.

1

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

## I.     Background Regarding the Types of Negative Options

The FTC uses the phrase "negative option marketing" broadly to refer to a category of commercial transactions in which sellers interpret a customer's failure to take an affirmative action, either to reject an offer or cancel an agreement, as assent to be charged for goods or services.  These transactions change the typical relationship between the buyer and seller, in which the buyer responds affirmatively to each offer made by the seller.  Instead, in a negative option transaction, the buyer and seller agree in advance that one or more subsequent offers from the seller will be deemed to be accepted unless the buyer explicitly rejects the offer.  Four types of plans fall within the negative option marketing category:  pre-notification negative option plans; continuity plans; automatic renewals; and free-to-pay or nominal fee-to-pay conversion plans.

In a pre-notification negative option plan, consumers receive periodic notices offering goods, often books or recorded music, and will receive the goods and incur a charge unless they specifically reject the offer.  In a continuity plan, consumers agree in advance to receive periodic shipments of goods or provision of services.  These consumers continue to receive shipments or services and incur charges until they take steps to cancel the arrangement.  In automatic renewal negative option offers, sellers automatically renew contracts, such as a one-year magazine subscription, at the end of a fixed period unless consumers instruct otherwise.  Marketers often structure trial offers as free-to-pay, or nominal fee-to-pay conversion plans, wherein consumers receive a good or service for free (or at a nominal price) for an introductory period.  They only incur a charge or pay a greater amount if they do not take affirmative action to cancel, reject, or return the good or service before the end of the trial period.

In addition, some negative option offers include bundled and upsell offers.  A bundled offer (which differs from the antitrust concept of bundling[4]) occurs when a seller combines two products or services in a package, requiring consumers to purchase both.  An upsell occurs when a consumer completes a primary transaction, and then receives a solicitation for an additional product or service.  There are two types of upsells:  internal and external.  In an internal upsell, a consumer buys an item from a seller, who then offers a negative option plan.  By contrast, in an external, or third-party upsell, a consumer buys an item from one seller, who then offers a negative option plan from a second seller.  The report discusses marketing principles for all these types of offers.

2

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

## II.   Summary of Panels and Comments

The Negative Option Workshop had four panel discussions, each addressing different topics related to online negative option marketing.  Panel One focused on the benefits and costs of negative option offers generally, from both business and consumer perspectives.  Panel Two presented information about consumer behavior online, including the extent to which people read online notices and disclosures.  Panel Three analyzed the FTC's clear and conspicuous standard in light of current research regarding online disclosures and the application of this standard to online negative option offers.  Panel Four discussed online negative option disclosures using mock Internet advertisements with negative option offers created by industry and consumer groups.  All four panels presented recommendations for online negative option offers.  This section summarizes the discussions from the four panels.

### A. Panel One: The Benefits and Costs of Negative Option Offers

The first workshop panel addressed the benefits and costs of negative option offers and featured Professor Avery Katz of Columbia Law School;[5] Robert Sherman, Counsel to the Direct Marketing Association ("DMA"); Rita Cohen, a Senior Vice President of the Magazine Publishers Association of America ("MPA"); and Susan Grant of the National Consumers League ("NCL").  The panelists discussed:

1) the benefits of negative options to sellers;
2) the benefits of negative options to consumers;
3) potential problems of negative options for consumers; and
4) recommendations for marketing negative options online.

### 1.   Benefits of Negative Option Offers to Sellers

Negative option offers benefit sellers by lowering costs and increasing revenue, thereby generating higher profits.  The panelists described three ways negative options lower costs for sellers.  First, according to DMA, such offers allow sellers to stock inventory efficiently.  By shipping products to consumers on a predetermined schedule, sellers can stock the appropriate inventory.[6]  Second, MPA noted that negative options help sellers avoid costs related to renewals.  In continuity plans, for example, sellers do not have to send multiple renewal notices and process consumer responses because buyers must specifically reject products to stop receiving them.[7]  Third, MPA explained that uninterrupted subscriptions save sellers money because interruptions

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

require sellers to update mailing lists, and, if a consumer subsequently renews, to send out missed copies in a separate, expensive mailing.[8]

In addition, Professor Katz explained how negative options lower overall messaging costs for sellers and buyers.  Generally, a transaction requires two messages:  an offer and an acceptance.  Because buyers tend to reject most offers, allowing buyers to reject offers by inaction saves time and effort.  In some situations, such as newspaper subscriptions or ongoing service contracts, however, buyers tend to accept most offers.  In these situations, the parties can save costs by allowing buyers to accept by inaction.  Professor Katz explained that this cost savings is the economic rationale for negative options.

According to the panelists, negative option offers may increase sellers' revenue and decrease their costs – therefore, increasing profits –  in three significant ways.  First, Professor Katz explained that sellers can increase sales through negative options.  Similarly, MPA noted that, in the context of magazine subscriptions, consumers are more likely to try a new magazine if they can receive an issue and cancel without having to pay if they do not like it.[9]  MPA further explained that negative option offers allow sellers to develop long-term relationships with consumers, who will more likely purchase additional goods from the seller in the future.[10]  Second, sellers make higher profits as a result of the reduction in messaging costs described above.  Third, sellers can charge more because the cost to buyers, in terms of time, energy, and other resources, of accepting an offer is lower, and the cost of rejecting an offer is higher, than in the usual case.  As a result, buyers are willing to pay somewhat more and tend to accept some offers they would normally reject through inaction.  Sellers understand this and charge higher prices under a negative option, thereby increasing revenue and profit.[11]

### 2.   Benefits of Negative Option Offers to Consumers

Panelists also noted several significant ways in which negative option offers benefit consumers.  First, DMA and MPA stated that consumers enjoy the convenience of the arrangements.  Depending on the type of negative option offer, consumers receive uninterrupted service or product shipments for as long as they want, and either avoid or face a greatly simplified renewal process.[12]  Second, DMA noted that some negative option offers allow consumers to examine products before purchasing.[13]  For example, consumers can receive and examine or inspect magazines and products such as collectibles before incurring a charge or agreeing to pay for the items.  Third, some negative option offers, DMA remarked, allow consumers to indicate their interests to sellers – such as in books or music – and their willingness

4

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

to receive more items in those categories.[14]  Fourth, Professor Katz explained that sellers may give buyers some up-front benefits, such as introductory gifts and free trials, to induce participation in a negative option.  Sellers may do so out of recognition that some buyers are reluctant to participate in a negative option because they are worried about accepting some offers they would normally reject, or paying more because of the seller's ability to charge more, as discussed above.  Finally, to the extent sellers in competitive markets pass on the cost reductions described in the previous section, consumers may also benefit from lower prices.

### 3.   Potential Problems with Negative Option Offers for Consumers

Despite their benefits, negative option offers also pose potential problems for consumers. According to Professor Katz, consumers lack bargaining power in these transactions because their silence constitutes acceptance of an offer and they must take action to reject future products or provisions of services.[15]  Reduced bargaining power, combined with the fact, as discussed above, that sellers may charge more for products sold via negative option offers, makes consumers vulnerable to "opportunistic offers with a very high price or with poor terms."[16] Professor Katz explained that to compensate for negative option offers with high prices or poor terms, sophisticated consumers may demand up-front benefits, such as introductory gifts or free trial offers, while sellers may take advantage of less savvy consumers.[17] Some negative option practices generate significant consumer dissatisfaction.[18]  According to NCL, consumers generally complain less about prenotification negative option plans, such as book or music clubs, than they do about other negative option offers.[19]  NCL explained that with prenotification plans, consumers typically respond to advertisements and agree to buy on a negative option basis because they want the specific goods offered.[20]  They also enjoy the benefit of receiving periodic announcements of products and notice of their option to cancel at any time.  By contrast, NCL noted that negative option continuity plans generate dissatisfaction.  In particular, NCL receives many complaints about such plans in the external, or third-party, upsell context.[21]  NCL reports that consumers often do not know that, if they accept the offer, the first merchant will transfer their financial account information to the second merchant.[22]  As a result, with a negative option upsell, even though the consumer has not shared this information with the second merchant, the second merchant may automatically charge the consumer's account at the end of a free trial period.  In short, NCL explained that in a negative option upsell situation consumers may not realize they agreed to a second purchase; may not know the second seller; and may not consent to transfer their credit card information to the second seller.

5

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

### 4. Panelist Recommendations

Several panelists recommended practices for sellers using negative option offers.  DMA, MPA, and NCL agreed that sellers should clearly disclose the existence and terms of the negative option offer.  DMA noted that the disclosures should be "easy to find, easy to read, and easy to understand."[23]  With regard to timing, MPA suggested marketers first make disclosures during the initial solicitation.[24]  NCL recommended that, in the free trial context, marketers make disclosures again at the end of the free term and obtain the consumers' consent to start charging.[25]

NCL also suggested that three specific negative option practices should be prohibited outright because they create serious detrimental consequences that cannot be prevented through disclosures.  First, according to NCL, companies that have consumers' financial information should not be allowed to share it with others for marketing purposes.[26]  Second, in a free trial context, NCL believes marketers should not be able to automatically enroll consumers in a paid plan at the end of the trial period without first notifying consumers and obtaining their consent to the paid plan.[27]  DMA disagreed with NCL about the cost and practicality of such additional notice.[28]  DMA noted that, even if inexpensive, marketers should not have to provide additional notice because consumers already consented to the arrangement when they accepted the free trial offer.[29]  Third, NCL recommended prohibiting sellers from charging consumers without their explicit consent.[30]  According to NCL, unauthorized billing is a particular concern when merchants charge consumers' debit cards, which, unlike credit cards, may charge consumers overdraft fees.[31]  NCL suggested that the FTC address continuity plans in its Prenotification Negative Option Rule.[32]

## B.  Panel Two: Analysis of Consumer Behavior Online

The second panel focused on consumer behavior online, and, in particular, on how people read and understand online contracts and notices.  The panelists were Susannah Fox, Associate Director of the Pew Internet and American Life Project; Professor Robert Hillman of Cornell Law School; and Jens Grossklags, a Ph.D. candidate at the School of Information at the University of California at Berkeley.[33]  This panel discussed:

    1) characteristics people exhibit online;

    2) the extent to which consumers read online notices; and

    3) recommendations for marketers to encourage consumers to read and understand negative option disclosures.

6

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

### 1.   Consumer Online Behavior

Ms. Fox presented demographic statistics regarding the Internet.  Based on research conducted by the Pew Internet and American Life Project, Ms. Fox explained that 70 percent of adults in the United States use the Internet.[34]  People over the age of 65 increasingly go online, as do people without college degrees.[35]  All the panelists noted that people using the Internet tend to, or are likely to, exhibit certain characteristics, including confidence, exuberance, and a desire for immediate gratification.  Each of these is discussed in turn below.

Internet users exhibit unwarranted self-confidence.  In a Pew study, users expressed confidence that they can keep their computers free from unwanted programs, but evidence shows many of these users unknowingly have harmful adware or spyware on their computers.[36]  Mr. Grossklags encountered similar unwarranted confidence in the subjects of his studies.  He explained that users believe they can fix any problem they may encounter by, for example, installing pop-up blockers, uninstalling programs, or, in the case of negative options, canceling the agreement.[37]  They do not consider that they may encounter difficulty addressing the negative consequences they may suffer.  Ms. Fox reported that Pew's evidence shows that not until users have been burned once — by spyware, for example — do they take steps to prevent the problem from reccurring.[38]

A second characteristic of people online involves what Professor Hillman and Mr. Grossklags described as "click happy" or exuberant Internet use.  Specifically, users click through webpages quickly, without paying much attention because they want to complete a given transaction.  Professor Hillman cited research finding that online shoppers "enter a seamless sequence of responses, a flow state in which their sense of time and reality become distorted and their self-control is diminished."[39]  As a result, and as discussed in more detail below, users do not read or understand the terms of agreements they enter into online.[40]

A third trait consumers demonstrate online, as they do offline, is the desire for immediate gratification.  Mr. Grossklags reported that consumer research shows that people have a strong desire for immediate gratification while undervaluing the future costs of their purchasing decisions.[41]  Compared to the offline world, consumers can more easily achieve immediate gratification online because they do not have to interact with others, wait in line, or even leave the house.  According to Mr. Grossklags, consumers' quest for immediate gratification, combined with their "click happiness" and the possibility of entering into a "flow state," suggests perils for consumers presented with online negative option contracts.[42]

## 2. Online Notices and Disclosures

The panelists explained that many consumers do not read notices and disclosures they encounter when buying or accepting goods or services online.  For example, one notice consumers often encounter when purchasing goods or downloading software is the end user licensing agreement, or "EULA."  According to Professor Hillman, research shows that people rarely read the terms of standard contracts, such as the EULA, before agreeing to them.[43]  Professor Hillman conducted an informal student survey in which 4 percent of the respondents indicated they read standard online forms as a general matter, while approximately 30 percent read the terms if they do not know the vendor or if the price is high.[44]  Professor Hillman posits that people do not read online forms because they are long, complicated, and full of legal terms.[45]  The subjects of Professor Hillman's study cited impatience and confidence that nothing will go wrong – traits consistent with "click happiness" and "flow states" – as reasons for not reading.[46]  Notably, they reported impatience even though 83 percent said they entered contracts online while at home, and 62 percent did so in the evening, when time was presumably less of a factor than during the day.[47]

In another study, Mr. Grossklags and his colleagues researched whether people read notices (either EULA-like long notices or short notices) when downloading software applications with spyware features that would negatively affect their computers.[48]  The findings were consistent with Professor Hillman's in that very few users read the standard EULA notice before installing software.[49]  On average, users spent 45 seconds scanning the notice, when fully reading it would typically take 10 minutes.[50]  Although very few subjects read the EULA, the majority proceeded to install software.[51]  With respect to one of the software applications offered, 70 percent of the subjects installed the program, but when later informed by the researchers of its spyware features, 98 percent of that group said they would not install that program in the future.[52]

In another component of Mr. Grossklags' study, users who installed one program saw an additional short notice with pertinent terms, including:  1) what information the software company collects from users' computers; 2) how the company uses that information; and 3) how the software affects users' computers negatively by, for example, automatically installing new software in the future.  Only 23 percent of those who were presented with this post-installation notice decided to keep, rather than uninstall, the program.[53]  Similarly, when shown the same short notice *before* installing the software, only 30 percent of the subjects chose to install the same program.[54]  This data indicates that far fewer people chose to install (30 percent) or keep

8

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

(23 percent) potentially harmful software after viewing well-designed short notices as compared to those users who installed such software after only seeing long EULA notices (70 percent).

### 3. Panelist Recommendations

Because online consumers often fail to read important notices, panelists made four recommendations regarding how marketers could disclose information concerning a negative option offer in a manner that encourages users to read and fully understand such information. The recommendations pertain to consumers' access to disclosures, the length of disclosures, the contents of disclosures, and cancellation procedures.

First, Professor Hillman proposed making standard contracts available to consumers before they begin a transaction with a seller.[55]  He preferred this approach to requiring consumers to click on or accept each material term of an offer, which could unnecessarily encumber transactions.[56]  Although Professor Hillman recognized that such availability would probably not increase consumers' reading of the contracts, he suggested that because watchdog groups would have better access to the terms, and could call attention to terms consumers might find unattractive, marketers would have a greater incentive to disclose adequately all material terms and/or make their offers more attractive to consumers.[57]  Mr. Grossklags questioned the effectiveness of this recommendation, noting that watchdog groups already have access to the standard contract language of many EULAs, and yet some marketers still fail to disclose adequately the material terms of offers.[58]

Second, regarding the length of disclosures, Mr. Grossklags recommended that marketers use short notices to increase the likelihood that people read them, and include the information most important to consumers.[59]  Ideally, a short notice would be no longer than five to six sentences, and would present all material terms in a comprehensible format such as a bulleted list of commonly-asked questions.[60]

Third, pertaining to content, Mr. Grossklags posited that short notices should also reveal any hidden or future costs to consumers – such as shipping and transaction costs – so that consumers can evaluate the full cost of a product.[61]  He noted, however, that determining the long-term cost of products sold in the negative option context is difficult for plans with indefinite durations.[62]

Finally, Mr. Grossklags also suggested that marketers provide a clear exit for consumers, who often do not understand the terms of even short notices because of their overconfidence, their entry into the "flow state," and marketers' attempts to deter users from reading.  Therefore, marketers should use clear, simple, and effective cancellation procedures.  In the event a

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

consumer does enter into a negative option plan and decides to discontinue that plan, according to Mr. Grossklags, acceptance and cancellation procedures should mirror one another.  In other words, it should be as easy to cancel as it is to accept and the consumer should be able to cancel through the same means as he or she accepted the offer.[63]

## C.  Panel Three: Application of the Clear and Conspicuous Standard to Online Offers with Negative Option Features

The third panel discussed the FTC's clear and conspicuous standard for disclosures and the application of this standard to negative option offers online.  The panelists were Lesley Fair, an attorney in the FTC's Division of Consumer and Business Education; Professor Mariea Hoy of the School of Advertising at the University of Tennessee; Jerry Cerasale, Senior Vice President of DMA; and Mark Huffman, Contributing Editor, Consumeraffairs.com ("Consumer Affairs").[64] The panel discussed:

1) the FTC's clear and conspicuous standard and empirical research regarding online disclosures;

2) the importance and challenges of making negative option disclosures; and

3) recommendations for online negative option disclosures.

### 1.   The Clear and Conspicuous Standard and Online Research

The FTC's Policy Statement on Deception provides that a marketer must disclose clearly and conspicuously any information necessary to prevent an advertisement or promotion from materially deceiving consumers.[65]  As Ms. Fair explained, when evaluating the effectiveness of any such disclosure, the test is whether reasonable consumers considering the transaction read and understand the disclosure.  The key issue under the FTC Act is the consumer's net impression, not what the advertiser intends to convey.[66]  The FTC's publication Dot Com Disclosures sets forth guidance for marketers evaluating whether online disclosures meet the clear and conspicuous standard using the four Ps – prominence, presentation, placement, and proximity.[67]  Professor Hoy used the guidance in Dot Com Disclosures in her recent study of banner advertisements on the top 100 websites.  She reviewed the advertisements to determine whether they contained disclosures, and whether the disclosures met the FTC's clear and conspicuous standard.  The study found that many of the banner ad disclosures were not clear and conspicuous.[68]

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

With respect to prominence, Ms. Fair explained that marketers need to pay attention to the appearance of the text of the disclosure.  For example, is it big and legible enough for consumers to read easily, particularly considering the age of the audience?  Advertisements targeted to seniors, or even consumers over 40 years old, for example, might require disclosures in larger print than those targeted to teens.[69]  Professor Hoy concluded that small type, all-capital letters, or hard-to-read fonts made some disclosures difficult to read.[70]  Also related to prominence is the extent to which the color of the disclosure text contrasts with the background color.[71]  Some advertisements Professor Hoy examined used text in colors that starkly contrasted with the background, which created a strong glare on the monitor and made reading the text difficult.[72]

Regarding presentation, Ms. Fair explained that advertisers should ask whether the wording, format, and font are easy for consumers to understand, encourage careful reading, and are free of legal jargon.[73]  Marketers also should ensure that other graphics on the screen do not compete with the disclosure for consumers' attention.[74]  Professor Hoy's study noted that some website features distract consumers.  For example, consumers who encounter a hyperlink between the offer and the disclosure may click away from the disclosure, failing to read it.  Professor Hoy explained that consumers are easily distracted in their browsing behavior and, once led a few pages away from an important disclosure, may not make it back to the disclosure.[75]

Professor Hoy explained that the degree to which consumers must scroll to read the full disclosure is an additional factor to consider in terms of presentation.  Professor Hoy's study found that 85 percent of the disclosures she studied required scrolling to find and read the full text.[76]  Professor Hoy described what she termed a "kitchen sink mega disclosure"– *i.e.,* a long, dense recitation of numerous, often unrelated, items requiring consumers to scroll repeatedly to read all of the information.[77]  According to Professor Hoy, scrolling is not an effective disclosure method because consumers will not scroll down and read the entire disclosure.[78]

Placement and proximity both relate to geography.  Ms. Fair explained that marketers should ask:  1) is the disclosure placed where consumers will look, and 2) is it close to the claim it qualifies?[79]  For instance, in Professor Hoy's study, nearly a third of the advertisements reviewed required consumers to click on various links to find the disclosures; thus the disclosures were not in close proximity to the claims.[80]  In addition to her study, Professor Hoy discussed other online research that uses eye-tracking software to follow Internet users' eye movements as they view webpages.[81]  The research, which examined webpages with claims and disclosures as well as pages displaying results from search pages, such as Google, found that users often scan a

11

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

webpage in an F-shaped pattern, reading across the top, down the left side and a little bit in the middle.[82]  Professor Hoy opined that this eye-tracking research may help marketers determine the best placement for important information.

New technology presents additional challenges for marketers attempting to make negative option disclosures clear and conspicuous.[83]  Both DMA and Consumer Affairs noted the growing use of mobile devices, such as cell phones, to access the Internet.[84] DMA mentioned cell phones as a particular problem because their screens are too small to include disclosures with the offer, and scrolling is often difficult or impossible.  As a result, according to DMA, smaller screen sizes may force marketers to make disclosures via hyperlinks.[85]

Regarding default settings and the variety of Internet browsers, DMA explained that marketers cannot predict what consumers will see when they access the Internet because consumers choose what to allow on their devices.[86]  For this reason, audio disclosures may be ineffective because consumers can turn off the sound.[87]  Further, marketers may not be able to rely on pop-up windows for making disclosures because many computers have software that allows consumers to block pop-up messages.[88]

Ms. Fair reiterated that when analyzing disclosures, the key issue under FTC law is the consumer's net impression – will the consumer see, read, and understand the disclosure?  The gold standard is a location where consumers cannot miss the disclosure to take part in the transaction.[89]

## 2.  Clear and Conspicuous Negative Option Disclosures

The panelists also discussed how the clear and conspicuous standard applies to negative option marketing.  They noted the importance of disclosures in the negative option context and discussed some of the biggest problems with negative option disclosures.

### a.  The Importance of Negative Option Disclosures

Disclosures are an integral part of the negative option product or service offer.  Both Consumer Affairs and DMA explained that effective negative option disclosures must inform consumers about the nature of the purchase and that a transaction is taking place.[90]  If consumers do not see or read the disclosures, they cannot provide informed consent to the offer.  Without informed consent, a consumer's acceptance is not valid.  In the negative option context, according to Consumer Affairs, disclosures should inform the consumer of the existence and terms of the transaction, as well as the continuing relationship with the seller.[91]

12

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

Both DMA and Consumer Affairs highlighted the adverse business consequences for marketers who fail to make appropriate disclosures.  According to Consumer Affairs, if consumers feel they were enrolled in negative option plans without their consent and incur unwanted charges as a result, they likely will stop purchasing from that company.[92]  DMA noted that the potential loss of consumer trust should motivate sellers to make sure consumers understand the terms and agree to them.  Earning and keeping consumers' trust is important for all businesses, but, as DMA suggested, it is particularly true for Internet marketers because of the increasing volume of Internet purchases and the ease with which consumers can buy from competitors.[93]

### b.  *Problems With Negative Option Disclosures*

Negative option offers provide significant benefits and conveniences, but certain types of negative option offers are also prone to disclosure problems.  Echoing observations made in Panel One, DMA noted that consumers generally enjoy automatic renewal newspaper subscriptions and prenotification negative option plans for books and music with little complaint.[94]  Problems more often arise with continuity plans or free-to-pay conversions, when, as Consumer Affairs described, the seller fails to disclose the existence of a negative option offer.[95]  This failure is a particular problem in the context of external upsells because the first company may share the consumer's billing information with a second company.[96]

Both DMA and Consumer Affairs noted that sharing billing information in a third-party upsell context can injure consumers who may not know of the information-sharing.[97]  They agreed that marketers must make appropriate disclosures to notify consumers that the transaction involves a second company that will obtain their credit or debit card information directly from the initial marketer.[98]  In addition, they noted that consumers may direct their anger at the initial marketer if it fails to make appropriate disclosures regarding the identity of the second seller and the transfer of billing information.  The consumer who trusts the first company and intends to purchase from it may blame that company for unwanted goods received from, and charges imposed by, the second company.[99]

### 3.   Panelist Recommendations

The panelists offered recommendations for making negative option disclosures clear and conspicuous.  Professor Hoy provided seven recommendations based on her own study and other research.  First, she suggested that marketers use repetition.  The Internet offers marketers nearly

13

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

infinite space to repeat information as often as necessary to ensure consumers read it.[100]  Second, according to Professor Hoy, marketers should locate important information where consumers will likely look, such as in the F-shape pattern revealed in eye-tracking research.[101]  Similarly, if a hyperlink is necessary, Professor Hoy recommended placing it in the same F-shaped area.[102]  Third, Professor Hoy advised marketers to consider enhancing the text size of the disclosures. In her view, marketers should design websites to allow consumers to control text size and background contrast, if possible.[103]  Fourth, marketers should not place hyperlinks between offers and disclosures because consumers may click on the hyperlinks and not come back to the disclosures.[104]  Fifth, Professor Hoy noted that marketers should label disclosures so consumers see and read them, perhaps using standard terms that consumers know and recognize.[105]  Sixth, Professor Hoy stated that marketers should minimize their use of links to make disclosures. If links are necessary, she again emphasized labeling and explained that labels need to alert consumers that they need to click on the link to access important information.[106]  Finally, Professor Hoy recommended that marketers limit the extent to which consumers need to scroll to read information.[107]

The panelists acknowledged the research from the morning panel indicating that consumers click past and fail to read many disclosures.[108]  To ensure consumers read disclosures, Consumer Affairs recommended that marketers use a fail-safe mechanism at the end of the transaction "to grab them by the lapels, hit them over the head, and say you're about to buy something."[109] For example, Consumer Affairs suggested showing consumers a summary screen with the item purchased, cost, method of shipment, shipping costs, and a "submit" button, before the sale becomes final.  The sale would not go through unless and until the consumer clicked that button.[110]

## D.  Panel Four: Making Effective Disclosures in Negative Option Marketing Online

Panel Four explored how to make negative option disclosures clear and conspicuous, yet compatible with the advertising message.  To promote discussion, FTC staff created a mock Internet advertisement based on a fictitious product with a negative option feature.  FTC staff asked the Electronic Retailing Association ("ERA") and Consumer Reports WebWatch ("WebWatch") to modify the mock advertisement to include a hypothetical negative option offer that reflected their vision of marketing principles for online negative option offers. Linda Goldstein presented ERA's advertisement, and Beau Brendler presented Web Watch's

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

advertisement.  David Mallen, from the National Advertising Division of the Council of Better Business Bureaus, and Nathaniel Good, a Ph.D. candidate at the University of California, Berkeley, School of Information Science, discussed and critiqued the advertisements produced by ERA and WebWatch.

### 1.    Summary of FTC Staff's Mock Advertisement Exercise

FTC staff's mock Internet advertisement features a saute pan offered by a fictional company, Fantastique Cuisine (Appendix ("App.") A).[111]  The pan costs $89.95, plus $7.95 shipping and handling.  The mock advertisement includes a series of four webpages:  a product description page (App. A, page one); a shopping cart page listing the product and cost, with a check-out button at the bottom (App. A, page two); an ordering page, on which consumers could enter shipping and billing information (App. A, page three); and a summary page reviewing the order, listing all charges, with a "place order" button at the bottom to complete the transaction (App. A, page four).  FTC staff gave ERA and WebWatch the terms of a hypothetical negative option offer and asked them to design an advertisement based on the four webpages above and integrating those negative option terms they believe the advertisement should disclose.  FTC staff asked ERA and WebWatch to comply with the relevant legal standards and create a compelling, persuasive, commercially-viable advertisement that exemplifies the principles marketers should follow when making negative option offers online.[112]

The terms of the hypothetical negative option feature include the following:

1) Purchasing the pan automatically enrolls consumers in a 30-day trial of Closet Gourmet Cook's Club, a fictitious entity;

2) As members of the club, consumers receive a free recipe file box in the mail and monthly recipes by email, along with restaurant discounts;

3) If consumers do not cancel within the 30-day trial, they incur a $4.95 monthly charge on the card used to buy the pan;

4) Membership continues indefinitely until consumers cancel; and

5) Closet Gourmet Cooks is a separate company from Fantastique Cuisine, the seller of the pan.[113]

### 2.    Summary of the Mock Advertisement Disclosures

FTC staff would like to thank ERA and WebWatch for creating these mock advertisements. Both advertisements were professionally presented, and we commend these organizations for

the considerable time and effort they invested preparing the advertisements.  Moreover, we are grateful for their willingness to invite constructive comments from other panelists.

### a.  ERA Mock Advertisement

Linda Goldstein presented ERA's advertisement and noted initially that the premise of the exercise, the bundling of the pan and club membership, requires disclosing the negative option offer at an earlier point than in a non-bundled negative option transaction.[114]  According to ERA, with non-bundled offers, disclosures must be made before consumers provide consent and incur a financial obligation.[115]  Here, however, because enrollment in the club is not optional, ERA determined that the advertisement needs to include something on the first page relating to the offer's negative option feature.[116]  Therefore, the following statement appears on the bottom of ERA's first page, the product description page:

> With your purchase you'll also enjoy a 30 day free trial membership in the Closet Gourmet Cook's Club with automatic renewal at $4.9[5]/ month.
> Click here for details.  (App. B, page one)

Consumers who want more details can click on the link, which opens a pop-up screen listing the full terms of the membership club (App. B, page two).[117]  ERA believes that a disclosure of all the material terms of the offer on the product description page is unwarranted at this point because it will distract consumers from the primary offer when they have not yet shown interest in purchasing the product.[118]

ERA's advertisement includes the following information about the negative option feature on the bottom of the next page, the shopping cart page:

> Includes 30 day free trial membership in Closet Gourmet Cook's Club with automatic renewal at $4.9[5]/month.  Click here for details.  (App. B, page three)

As with the first page, the advertisement discloses the existence of the negative option offer, with the full terms accessible by hyperlink.  ERA believes that a full disclosure of all material terms is still unnecessary at this point because the consumer has not consented to the sale or incurred a financial obligation.[119]

ERA created three alternative scenarios for the last two pages to illustrate that there is more than one correct way to make these disclosures.  Alternative One discloses the full terms of the negative option offer along the right side of the ordering page, where consumers enter shipping

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

and payment information (App. B, page four).  Although ERA elected to disclose the full offer terms here, it believes it may be appropriate to put some of the terms, such as the cancellation information, on the next page.[120]  On the final summary page of Alternative One, ERA lists the recipe club free trial membership along with the pan as the item purchased and includes a button labeled "Review Club Details" at the bottom of the page that links to the full terms (App. B, page five).

In Alternatives Two and Three, ERA has consumers enter shipping and payment information on two separate pages.[121]  In ERA's view, placing the payment and shipping information forms on different pages lets the marketer decide where to locate disclosures.[122]  Thus, on the shipping page in both Alternatives, ERA's disclosure states:  "Shipment includes the 30 day free trial membership in Closet Gourmet Cook's Club with automatic renewal at $4.95 a month." (App. B, page six).

In Alternative Two, once a consumer enters shipping information and clicks "Continue," a pop-up window discloses the terms of the negative option offer (App. B, page seven). Consumers must click "Close Window" to exit the pop-up and move to the next page, the payment page.[123]  On that page, below the fields for credit card information, and above the "Place My Order" button, ERA includes this disclosure:

> By clicking "Place My Order" below, you agree to the following:
> - Your purchase includes a 30-day free trial membership in Closet Gourmet Cook's Club.
> - You authorize Cook's Gourmet to obtain your account information from Fantastique Cuisine and to charge your cards $4.95/month after the free trial unless you cancel.  (App. B, page eight)

In Alternative Three, after entering shipping information and clicking "Continue" as in Alternative Two, the consumer proceeds to the payment page (App. B, page nine).  There, the following disclosure appears below the fields for credit card information and above the "Place My Order" button:

> I understand that my purchase includes a free 30 day trial membership in Closet Gourmet Cook's Club and free recipe box.  As a club member, I'll enjoy three new recipes emailed to me each month and discount coupons for savings at my favorite restaurants.  After the free trial unless I cancel, my membership will automatically continue for just $4.95 [a] month which I authorize Closet Gourmet to charge to the credit card I'm providing.  I can cancel at anytime by calling 1-800-xxxx or online at www.cooksclub.com, but no matter what I decide the recipe box is mine to keep.  (App. B, page nine)

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

b. *Consumer Reports WebWatch Mock Advertisement*

Beau Brendler, Director of Consumer Reports WebWatch, presented WebWatch's mock advertisement.[124]  Like ERA, WebWatch includes disclosures about the negative option offer on more than one page in the ordering sequence, however, the placement and content of the disclosures differ from ERA's.  On the first page, the product description, WebWatch includes a disclosure about the negative option offer that reads:

> NOTE:  Purchase of this item enrolls you automatically for a free 30-day trial in the Closet Gourmet Cook's Club.  Club membership is $4.95 a month, automatically billed to your credit card.  You'll be e-mailed 3 gourmet recipes each month from New York's finest restaurants, and you'll receive a recipe box with your pan that's yours to keep even if you decide to cancel club membership right away.  Click here for more details.  (App. C, page one)

WebWatch explained that it considered the hypothetical scenario involving the bundling of the pan with the membership unusual enough to strongly emphasize this feature for the consumer.  Therefore, WebWatch's initial disclosure seeks to alert consumers that they cannot uncouple the two transactions.[125]

If a consumer clicks for more details at this point, the consumer proceeds to a new page describing the terms and conditions of the Cook's Club offer (App. C, page two).  WebWatch added this page so that one page in the series includes all of the terms and conditions of the transaction.126

On the next page, the shopping cart page, the following disclosure appears below the product's total cost and above the "Checkout" button:

> NOTE:  Clicking the checkout button and purchasing the all-purpose saute pan automatically enrolls you in a 30-day free trial of the Closet Gourmet Cook's club.  Subsequent monthly membership [at] $4.95/ month automatically billed to credit card as "Closet Gourmet Cook's." (App. C, page three)

WebWatch included this disclosure to attempt to call attention to both the consumer's automatic enrollment in the Cook's Club upon purchase and the third-party billing feature.[127]

The next page of the sequence is the ordering page.  WebWatch placed the following disclosure between the fields for shipping and credit card information:

18

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

> I understand the terms and conditions of this transaction, that purchase automatically enrolls me in a 30-day free trial of the Closet Gourmet Cook's Club.  Fantastique Cuisine will disclose my credit card information to a third party which, after 30 days, will charge my account $4.95 per month membership (as "Closet Gourmet Cook's ["]).  With my purchase I will receive a free recipe file which I may keep even if I choose to cancel membership.  I may cancel membership at any time by calling, 1-800-cookclub, or online at www.closetgourmetcooks.com (App. C, page four)

Consumers must click the adjacent check box to indicate that they understand the terms of the offer.  If they fail to do so, even if they enter credit card information, an error message appears and the transaction fails.[128]

The final page of the WebWatch advertisement, the summary page, includes the following in the breakdown of the purchase cost:  "One-month trial membership in the Closet Gourmet Cook's Club.  Click here for details.  FREE" (App. C, page five).  WebWatch believes this presents the offer in a marketing-friendly way while alerting consumers again to the free trial.[129]

WebWatch also designed an alternative shopping cart page, on which consumers must click either "Yes" or "No" to accept or decline the Cook's Club membership as part of their pan purchase (App C, page six).  Although not part of the hypothetical, WebWatch presented this alternative because it believes that the best policy from a consumer perspective is to allow consumers to buy the pan with or without the trial membership.[130]  In this version, after checking "Yes" or "No," consumers proceed to the ordering page and complete the transaction.

### 3.    Evaluation of the Disclosures in the Mock Advertisements

Following the ERA and WebWatch presentations, the panel discussants, Nathan Good, from the University of California School of Information Science, and David Mallen, from the National Advertising Division of the Council of Better Business Bureaus, orally evaluated both advertisements.  Mr. Good also provided a detailed written analysis of ERA and WebWatch's submissions based on his own and others' research of online consumer behavior.  Mr. Mallen provided brief written comments on both advertisements.[131]  In their view, to comply with the FTC Act, the advertisements need to clearly and conspicuously disclose the club membership, the monthly cost of the membership, cancellation information, and the third-party billing feature, before the consumer agrees to purchase the pan.[132]  According to Mr. Good and Mr. Mallen, although both advertisements disclosed the negative option offer's material terms, they opined that some disclosures were more effective than others.

19

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

### a.  ERA Advertisement

ERA's initial product description includes a short disclosure alerting consumers to the Closet Gourmet Cook's Club trial offer with a "Click For Details" link.  Mr. Good described this disclosure as a promising start, but argued that ERA should have included more details about the offer at this point.[133]  Similarly, Mr. Mallen stated that it may be more effective to make all material disclosures at this point, before the consumer places the item in the shopping cart.[134]  Mr. Good further stated that the disclosure resembles a banner advertisement, which consumers routinely ignore.[135]  If consumers click on the link, a pop-up notice appears.  According to Mr. Good, not only does the pop-up distract from the logical progression and flow of the checkout process, but research shows that users often automatically close pop-ups without reading their content.[136]

Mr. Good noted that the text on the shopping cart page regarding the negative option offer was set off with an asterisk and, therefore, hard to find because it was placed away from the main focus of the user's attention.[137]  In his view, at this point in the transaction, a user would focus on the price and quantity information located in the middle of the screen.  Therefore, because the membership, unless cancelled, increases the total cost of the transaction, Mr. Good suggested placing the trial membership notice closer to the price of the pan. [138]

The discussants also evaluated ERA's three alternative ordering sequence webpages.  The first alternative contains a disclosure of the negative option offer along the right side of the webpage.  Mr. Good described this as an awkward location because it breaks the grouping of the webpage, making it harder for consumers to notice and associate it with their purchase.[139]  In addition, he noted that the disclosure appears on a page where consumers provide information to complete the order, such as payment information, having already made a purchasing decision.[140]  According to Mr. Good, the notice would better inform consumers at an earlier point, when they have read about the pan, but have not yet decided whether to purchase it.[141]

The next page in ERA's first alternative, the "Place Order" page, lists the free trial offer along with the pan's cost.  According to Mr. Good, this page has good feedback for consumers,  keeps the disclosure in line with the purchase items, and allows consumers to continue the transaction or cancel the order.[142]  He noted, however, that the page may not adequately inform consumers about the exact terms of the free trial membership, future charges, and how to cancel.[143]  To find such information, consumers must click on a link located at the bottom of the webpage.

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

In ERA's second alternative ordering sequence, a pop-up window discloses the negative option terms.  Mr. Good reiterated his assertion that consumers typically ignore pop-ups or their software blocks them, thus disclosures presented in pop-ups are not effective.[144]  Regarding the next page in the ordering sequence, which includes disclosures above the credit card information fields, Mr. Good noted that this page provides better feedback to consumers than the disclosure on the right side of the page.[145]  In his view, the disclosure here is concise, uses bullet points, and is located where consumers will likely see it.  He opined, however, that the disclosure font is too small and resembles one of the license agreements that consumers often ignore.[146]  In addition, consumers enter credit card information at this point and will likely look back and forth between their card and the screen, possibly distracting them from reading the text below.  According to Mr. Good, consumers will want to move forward upon entering their billing information, so the best opportunity to catch their attention comes before that point.[147]

Regarding ERA's third alternative, although the disclosure also appears above the credit card information, Mr. Good believes this alternative is more effective than the others because it contains a more complete description, including cancellation instructions.[148]  He did note, however, that the font may still be too small, as in the second alternative sequence of pages.[149]  Despite the helpful information regarding how to cancel online or by phone, consumers may not remember the web address or phone number when they need it.  Mr. Good, therefore, recommended that the marketer send an email to consumers including cancellation information, along with a means to re-access the website in order to cancel.[150]  In his view, the most consumer-friendly cancellation method would allow cancellation via the same means by which consumers placed their order.[151]

### b.  WebWatch Advertisement

Turning to WebWatch's advertisement, both Mr. Mallen and Mr. Good agreed with WebWatch's approach of disclosing the material terms of the club offer before consumers add the pan to the shopping cart.[152]  However, they both felt that consumers likely would not read the disclosure on the first page due to its length.[153]  Mr. Good added that the disclosure resembles a licensing agreement, which research shows many consumers click past without reading.[154]  To make it more effective, he proposed reformatting the disclosure, perhaps using short bullet points.[155]

On WebWatch's second page, the disclosure of the detailed terms appears if consumers click on the link for details.  Mr. Good opined that this disclosure provides good notice to consumers

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

because of its large, relatively easy-to-read font.  He noted, however, three potential problems.[156]  First, the dense recitation of terms and conditions resembles a license agreement, which consumers tend not to read.  Second, consumers might ignore the disclosure because the text seems disconnected from the product purchase and description.  Third, the disclosure does not explain the link between the recipe club and the pan.

On the next page, the shopping cart page, the disclosure appears under the product listings and above the checkout button.  Mr. Good approved of the disclosure of information at this point, but noted two presentation problems similar to those found in prior disclosures.[157]  First, the text is lengthy and not presented in a way that will grab consumers' attention.  Second, the format resembles that of an often-ignored license agreement.  Mr. Good suggested changing the heading from "Note" to "Important information for your 30 day trial" or, more directly, to "After 30 days, your card will be billed, info below" to ensure consumers know the disclosure contains important information.

The shipping information page follows the shopping cart page and includes a disclosure above where consumers enter credit card information.  The disclosure includes a check-box that consumers must click to indicate they understand the terms of the club trial offer.  Mr. Good noted that the page helpfully incorporates an opt-in mechanism and the text placement (above the credit-card entry) is noticeable.[158]  Like ERA's disclosures, however, the disclosure appears after consumers have made a purchasing decision, at a time when they simply want to complete the transaction.  As a result, in Mr. Good's view, consumers may click the box automatically without reading the text.[159]

The final page in the WebWatch sequence, the summary page, includes the club membership in the list of items purchased.  The trial membership is listed as "FREE", next to a "Click here for details" link.  Mr. Good opined that including such information as part of the overall purchase information is an excellent practice because consumers typically scan a summary page to confirm their order and, therefore, will likely notice the membership.[160]  He did note, however, that consumers may ignore the "details" link because it requires breaking the flow of the transaction to learn more.  Therefore, he suggested that WebWatch add a bullet point describing the additional potential charges, such as "free for 30 days/$4.95 per month billed automatically after," to reduce the need for consumers to click elsewhere to learn the terms of the "free" trial.[161]

Finally, Mr. Good commented that WebWatch's alternative shopping cart page (App. C, page six), requiring consumers to accept or decline the club membership, is a better approach because

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

it clearly alerts consumers to the fact that they must make a choice.[162]  He noted that the design includes many good features, such as a line-item description of the offer at the time of decision making, opt-in choices that facilitate reading, the use of highlighting and large fonts to attract attention, and inclusion of the information above the checkout button.[163]  As discussed above, this alternative scenario un-bundled the pan and club membership, giving consumers a choice to take or leave the membership, and was not part of the exercise.  As such, ERA did not include an example of negative option disclosures for an un-bundled negative option offer that the discussants could evaluate.

### 4.  Negative Option Disclosures Generally

In addition to presenting and evaluating the mock advertisements during Panel Four, the panelists discussed negative option disclosures more generally.  Representatives of ERA and WebWatch described their organizations' views regarding negative option offers, and the panel discussed challenging aspects of, and recommendations for, making effective disclosures.

#### a.  ERA and WebWatch Views

ERA first described its general views regarding negative option disclosures.  As a threshold matter, ERA believes that if a marketer discloses the conditions associated with a negative option transaction adequately, it can reasonably expect consumers to abide by them, just as consumers expect sellers to abide by the conditions of the offer.[164]

Regarding online disclosures, ERA explained that an online negative option offer is a continuous process, consisting of a sequence of webpages.  When evaluating disclosures, therefore, one must view the process in its entirety to determine the consumer's net impression.[165]  With that in mind, ERA made four additional points about online disclosures.  First, marketers should make disclosures unavoidable and present them before the consumer incurs any financial obligation.[166]  Second, marketers need not make an early disclosure, such as on the first page, except for bundled products like the hypothetical pan and recipe club.  According to ERA, an early disclosure is unwarranted because marketers need to gauge a consumer's interest before disclosing all the negative option details.[167]  Third, marketers need not make post-consent disclosures if they disclosed the material terms properly and consumers consented to them.[168]  Fourth, pop-ups, when properly used, can effectively make negative option disclosures.[169]

WebWatch also discussed its views regarding disclosure obligations, customer service, and opt-ins.  WebWatch believes marketers should disclose negative option terms early in the

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

transaction process and that they should disclose relevant financial relationships fully.[170]  In its view, such disclosures are part of providing good customer service.  WebWatch prefers that marketers structure negative option offers with an opt-in feature.  A clear Yes/No choice would be a simple, consumer-friendly, way to present negative option offers on small devices such as cell phones, which may be particularly complicated marketing contexts for consumers.[171]

### b.  *Disclosure Challenges and Panelist Recommendations*

Mr. Good raised two major challenges for marketers making negative option disclosures, consumer "inertia" and inattention, and offered some recommendations.[172]

As an example of inertia, Mr. Good cited the commonly-used feature of online shopping carts, which involve a standard linear progression from order to check-out that varies little among sites.[173]  Because of this standardization, consumers move through the process quickly, almost through habit, and become impatient clicking through screens to complete the transaction.[174]  Such behavior is consistent with the research cited in earlier panels regarding consumers being "click happy" and entering a "flow state."

It may be challenging to provide adequate disclosures when a consumer is in such a state of inertia.  According to Mr. Good, marketers should consider increasing the number of disclosures and screens consumers must click through, while taking care to maintain a logical progression for the transaction.[175]  Mr. Good bases his recommendation on online consumer eyetracking research, which indicates that ensuring consumers understand the transaction process prevents them from becoming frustrated or distracted by having them click through additional screens.[176]  If a shopping sequence deviates from the usual flow, consumers may become confused and abandon the transaction before completing the purchase.[177]

The second major challenge, inattention, is the difficulty in both catching and keeping consumers' attention online.  Mr. Good explained that consumers' prior experiences and habits may cause them to miss certain text and cues that designers create to inform consumers.[178]  Further, consumers are accustomed to certain webpage designs and features, and, therefore, may ignore peripheral designs and features that seem unrelated to their main task, completing the transaction.[179]  For example, consumers likely will ignore text placed next to navigation icons or graphics.  They also will ignore banner advertisements, and, therefore, likely will ignore text in or near banner advertisements as well.

To combat inattention, Mr. Good offered several suggestions.  First, keep similar items grouped together.[180]  Second, research shows that consumers' eyes generally follow their mouse

24

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

cursor, so marketers should place information consumers need to read where their cursor is most likely to be.  For example, putting text about price, shipping, and final cost in the shopping cart will likely catch consumers' attention.[181]  By contrast, research reveals that pop-ups do not effectively grab consumers' attention.[182]  Finally, echoing the sentiments of earlier panelists, Mr. Mallen noted that pre-checked boxes do not effectively disclose information because they signal to consumers that the information is routine or unimportant.[183]

## E.  Comments Filed in Response to Federal Register Notice

In addition to the workshop panelists, individuals and groups offering both consumer and industry perspectives submitted comments in response to the FTC's Federal Register Notice.[184]

Three consumers and one consumer organization submitted comments.  One consumer urges the FTC to examine the difficulties consumers face when cancelling negative option plans.  Another notes that, in the automatic renewals context, marketers should have to send out reminder notices well in advance of renewal dates.  A third questions the appropriate way to measure affirmative consent online, whether by check box, scroll box, typing initials, or clicking a "submit" button and requests that the FTC provide guidance.  NCL also filed a comment reflecting the substance of Susan Grant's workshop presentation, summarizing common consumer complaints regarding negative option offers, and making three general recommendations:  1) marketers should improve their negative option disclosures; 2) marketers should be prohibited from sharing consumers' financial information for marketing purposes; and 3) continuity plans should be brought within the purview of the FTC's Negative Option Rule.

Two industry groups, ERA and MPA, also submitted comments.  ERA believes that the present regulatory structure – including the Prenotification Negative Option Plan Rule, the deception and unfairness standards of Section 5 of the FTC Act, and the Telemarketing Sales Rule – already sufficiently addresses issues related to online negative option marketing.  ERA also emphasizes the importance of allowing marketers flexibility in presenting negative option offers and highlighted its own Advance Consent Marketing Guidelines.  In its comment, MPA notes that it publishes guides for its members on topics related to negative option marketing. MPA noted that its guides mirror the recommendations of many of the workshop panelists, including the use of clear and conspicuous disclosure of material terms and easily implemented cancellation procedures.  Regarding cancellation procedures, MPA recommends that marketers employ adequately staffed toll-free numbers and promptly process cancellations via recorded

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

phone messages. Notably, MPA also recommends sending reminder notices to magazine subscribers prior to the start of each renewal term.

Finally, the Samuelson Law, Technology, & Public Policy Clinic of the University of California, Berkeley, School of Law submitted evidence related to several key issues of negative option marketing: consumers' reading and installation behavior, presentation of price, intertemporal decision-making, and transaction costs.[185] The research and evidence are consistent with Mr. Grossklags' and Mr. Good's workshop presentations.

## III.  Marketing Principles for Online Negative Option Offers

Based on recent FTC cases alleging deceptive practices in online negative option marketing and comments of workshop panelists, FTC staff have developed five principles to guide industry in complying with Section 5 of the FTC Act when making online negative option offers. These principles address:

1) the disclosure of material terms;
2) the appearance of disclosures;
3) the timing of disclosures;
4) obtaining consumers' affirmative consent; and
5) cancellation procedures.

**Principle One:  Marketers should disclose the material terms of the offer in an understandable manner.**

Principle One addresses the disclosure of the material terms of a negative option offer. Section 5 requires that marketers clearly disclose an offer's material terms in an understandable manner.[186] To comply with the law, marketers of negative option offers should disclose, at a minimum, the following key terms:  the existence of the negative option offer; the offer's total cost; the transfer of a consumer's billing information to a third party, if applicable; and how to cancel the offer.[187] Moreover, to make disclosures understandable to consumers, marketers should avoid making vague or unnecessarily long disclosures and also avoid making inconsistent disclosures for the same offer.[188]

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

**Principle Two:  Marketers should make the appearance of disclosures clear and conspicuous.**

Principle Two addresses the appearance of negative option disclosures.  Section 5 requires that disclosures be clear and conspicuous.[189]  To present disclosures so that they comply with Section 5, marketers should, at a minimum, do the following.

First, place disclosures in a location on the webpage where consumers are likely to see them.  To ensure that consumers are likely to see them, marketers should avoid:  placing them far down on web pages or near distracting features such as banner ads or hyperlinks to unrelated webpages; burying them in long paragraphs of dense text; and displaying them such that consumers must enlarge the screen containing the terms or scroll to read the material terms.[190]

Second, label disclosures (and links to them) to indicate the importance and relevance of the information.[191]  For example, labels such as "terms of use," "home delivery plan," and "Click here to see how this offer works" do not adequately convey to consumers that any accompanying text discloses material terms of the negative option offer.[192]  Avoid using links to disclose information, such as cost information, that is an integral part of or inseparable from a negative option offer; instead limit their use to the disclosure of lengthy details such as specific instructions on how to cancel.[193]

Third, use text in sizes and colors that make them easy to find and read.[194]  Accordingly, disclosure text should not be:  small; in long passages that are single-spaced or in all-capital letters; or in colors that do not adequately contrast with the webpage background.[195]

**Principle Three:  Marketers should disclose the offer's material terms before consumers pay or incur a financial obligation.**

Principle Three addresses the timing of negative option disclosures.  Section 5 requires disclosing the material terms of the negative option offer before consumers agree to the purchase.[196]  Often, consumers agree to a purchase at the point when they finalize their orders by, for example, clicking a button labeled "Finalize my Order" or "Submit my Order."  To comply with Section 5, marketers should disclose the terms before consumers incur a financial obligation.[197]  During the panel discussion, participants discussed situations where it may be appropriate to disclose important information more than once in an advertisement.

**Principle Four:  Marketers should obtain consumers' affirmative consent to the offer.**

Principle Four addresses consent to negative option offers.  Section 5 requires that marketers obtain consumers' consent to such offers.[198]  To comply with Section 5, marketers should require

27

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

consumers to take an affirmative step, such as clicking "I agree," for example, to demonstrate their consent.[199]  Similarly, marketers should not rely on pre-checked boxes, which consumers may neither notice nor read before completing their order, as evidence of consumers' consent.[200]

**Principle Five:  Marketers should not impede the effective operation of promised cancellation procedures.**

Principle Five addresses cancellation procedures for negative option offers.  Section 5 requires that such procedures be effective.[201]  To comply with Section 5, marketers should not impede the effective operation of promised cancellation procedures, and should honor cancellation requests that comply with such procedures.[202]  In implementing effective cancellation procedures, marketers should not, among other things:  hang up on consumers who call to cancel; place them on hold for an unreasonably long time; provide false information about how to cancel; or misrepresent the reasons for delays in processing consumers' cancellation requests.[203]

Following the five principles set forth above should maximize the likelihood of compliance with Section 5, although whether a particular negative option offer violates Section 5 will depend on an individualized assessment of the advertisement's net impression and the marketer's business practices.

## IV.   Suggested Areas for Future Research

Looking to the future, the comments and workshop presentations suggest areas for research that may inform the actions of FTC staff, marketers, and consumer advocates.  With such research, the FTC could better advise online marketers, educate consumers, target deceptive practices, and fashion appropriate relief for marketers who violate the FTC Act.  Research in several areas would be especially useful.  First, further research in the area of online consumer behavior – including where consumers look, what they read, and what they are likely to click – would help FTC staff to evaluate the appropriateness of the timing, content, and placement of online disclosures.  Second, research into how consumers use mobile devices with very small screens to purchase products or services could help in understanding the role of clear and conspicuous disclosures in emerging technological contexts.  Third, it would be helpful to learn more about the value and effectiveness of follow-up reminders, which several panelists recommended.  Particularly relevant studies would evaluate whether consumers notice and read post-transaction correspondence, whether email or mail more effectively communicates

28

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

disclosures, whether post-transaction disclosures improve consumer satisfaction, and whether such disclosures increase cancellation rates.  Finally, studies evaluating the effectiveness and burdensomeness of various negative option cancellation procedures would aid in the understanding of how to best provide appropriate means of cancellation.

## V.  Conclusion

The workshop brought together industry and consumer groups, and members of the academic community, to discuss marketing negative option offers in the ever-expanding online marketplace.  Panelists throughout the day explained that Internet-based negative option marketing poses unique issues not present in print or telephone marketing.  The marketing principles set forth in this report, therefore, attempt to address these issues.

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

# Endnotes

1. This Report represents the views of the FTC staff and does not necessarily represent the views of the Commission or any individual Commissioner. The FTC announced this workshop in a Federal Register Notice. Public Workshop: Negative Options: An FTC Workshop Analyzing Negative Option Marketing, 71 Fed. Reg. 77753 (Dec. 27, 2006). The workshop transcript ("Tr.") is available at: http://www.ftc.gov/bcp/workshops/negativeoption/index.shtml.

2. The Commission has several law enforcement tools to combat abuses in negative option marketing. Section 5 of the FTC Act prohibits unfair and deceptive trade practices. The Rule Concerning the Use of Prenotification Negative Option Plans (16 C.F.R. Part 425) regulates one kind of negative option offer. The Telemarketing Sales Rule (16 C.F.R. Part 310) applies to negative option offers made over the telephone. Additionally, the Electronic Funds Transfer Act (15 U.S.C. § 1693 et seq.) can apply to transactions involving recurring charges to consumers' debit cards or bank accounts, and the Unordered Merchandise Statute (39 U.S.C. § 3009) can apply to negative option offers involving the mailing of unordered merchandise.

3. Two FTC publications that address online marketing more generally, Dot Com Disclosures: Information about Online Advertising, and Advertising and Marketing on the Internet: Rules of the Road, provide guidance on how to make negative option disclosures clear and conspicuous to obtain consumers' express informed consent. These publications are available on the FTC website at: http://www.ftc.gov/bcp/edu/pubs/business/ecommerce/bus41.pdf, and http://www.ftc.gov/bcp/edu/pubs/business/textile/bus21.shtm.

4. Bundling, for antitrust purposes, involves situations in which buyers could purchase items separately from a seller, but receive more advantageous terms from that seller by purchasing goods or services together.

5. Professor Katz's entire presentation is available at http://www.ftc.gov/bcp/workshops/negativeoption/presentations/Katz.pdf.

6. Sherman, Tr. 56.

7. Cohen, Tr. 60.

8. Cohen, Tr. 60.

9. Cohen, Tr. 62.

10. Cohen, Tr. 60-1.

11. Katz, Tr. 43.

12. Sherman, Tr. 54. Referring to automatic renewals, Ms. Cohen noted: "Given the hectic pace of today's jam-packed lifestyle, customers value the convenience of not having to write a check or send back a renewal notice to subscriptions that are part of their daily routine." Cohen, Tr. 60.

13. Sherman, Tr. 55-6.

14. Sherman, Tr. 53-4.

15. Katz, Tr. 41.

16. Katz, Tr. 44.

17. Katz, Tr. 41.

18. Grant, Tr. 67-70.

19. Grant, Tr. 67. Ms. Grant noted that, in general, consumers complain about sellers' failure to disclose the existence of the negative option offer more than they complain about other aspects, such as the difficulties of cancelling.

20. Grant, Tr. 67.

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

21.   Grant, Tr. 67-8.

22.   Grant, Tr. 68.

23.   Sherman, Tr. 57.

24.   Cohen, Tr. 63.

25.   Grant, Tr. 70.

26.   Grant, Tr. 70.

27.   Grant, Tr. 70.

28.   Sherman, Tr. 80-1; Grant, Tr. 81.

29.   Sherman, Tr. 80.

30.   Grant, Tr. 71.

31.   Grant, Tr. 71.

32.   Grant, Tr. 70.

33.   The entire presentations of Ms. Fox and Mr. Grossklags are available at http://www.ftc.gov/bcp/workshops/ negativeoption/presentations/Fox.pdf and  http://www.ftc.gov/bcp/workshops/negativeoption/presentations/ Grossklags.pdf.

34.   Fox, Tr. 84-5.

35.   Fox, Tr. 85-6.

36.   Fox, Tr. 86-7.

37.   Grossklags, Tr. 105.

38.   Fox, Tr. 88.

39.   Hillman, Tr. 94.

40.   Hillman, Tr. 94-5; Grossklags, Tr. 104-5.

41.   Grossklags, Tr. 107-8.

42.   Grossklags, Tr. 108.

43.   Hillman, Tr. 91.

44.   Hillman, Tr. 95-6.

45.   Hillman, Tr. 92.

46.   Hillman, Tr. 96.

47.   Hillman, Tr. 96.

48.   The study, Noticing Notice: A Large-Scale Experiment on the Timing of Software License Agreements, is available at:  http://people.ischool.berkeley.edu/~jensg/research/paper/Grossklags07-CHI-noticing_notice.pdf.

49.   Grossklags, Tr. 102.

50.   Grossklags, Tr. 102-3.

51.   Grossklags, Tr. 103.

52.   Grossklags, Tr. 103; see also Grossklags presentation slide 6.

31

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

53. Grossklags presentation slide 8.

54. Grossklags presentation slide 8.

55. Hillman, Tr. 99-100.

56. Hillman, Tr. 98.

57. Hillman, Tr. 100.

58. Grossklags, Tr. 117.

59. Grossklags, Tr. 114, 122.

60. Grossklags, Tr. 122.

61. Grossklags, Tr. 106.

62. Grossklags, Tr. 106-7.

63. Grossklags, Tr. 110.

64. The entire presentations of Ms. Fair and Professor Hoy are available at http://www.ftc.gov/bcp/workshops/negativeoption/presentations/Fair.pdf and http://www.ftc.gov/bcp/workshops/negativeoption/presentations/Hoy.pdf.

65. Fair, Tr. 125-7; FTC Policy Statement on Deception, appended to *Cliffdale Associates, Inc.*, 103 F.T.C. 110, 174 (1984), available at http://www.ftc.gov/bcp/policystmt/ad-decept.htm.  The specific requirements necessary to satisfy the "clear and conspicuous" standard often vary by the type of media in which the advertisement appears.  For example, in print advertisements, the FTC has found fine print footnotes or dense blocks of text insufficient to modify a claim made elsewhere in the ad.  In television commercials, problematic elements have included video superscripts that are superimposed on distracting backgrounds or that compete with the commercial's audio elements.  The publication FTC Advertisement Enforcement Disclosures in Advertising (2001), available at http://www.ftc.gov/bcp/workshops/disclosures/cases/index.html, summarizes representative FTC cases regarding disclosures made in print advertisements and television commercials.  As noted in Endnote 3, supra, two other FTC publications, Dot Com Disclosures:  Information about Online Advertising, and Advertising and Marketing on the Internet:  Rules of the Road provide guidance on the "clear and conspicuous" standard in online advertisements.

66. Fair, Tr. 129-30.

67. Fair, Tr. 135; *see also* http://www.ftc.gov/bcp/edu/pubs/business/ecommerce/bus41.pdf.  Regarding the application of the clear and conspicuous standard to media other than the Internet, the publication FTC Advertisement Enforcement Disclosures in Advertising (2001), available at http://www.ftc.gov/bcp/workshops/disclosures/cases/index.html, summarizes representative FTC cases regarding disclosures made in print advertisements and television commercials.  Ms. Fair also mentioned the 2001 workshop titled, "Disclosure Exposure:  An FTC-NAD Workshop on Effective Disclosures in Advertising," available at http://www.ftc.gov/bcp/workshops/disclosures/index.shtm.

68. Hoy, Tr. 139-40.

69. Fair, Tr. 129.

70. Hoy, Tr. 142-4.

71. Hoy, Tr. 142-4.

72. Hoy, Tr. 142-3.

73. Fair, Tr. 130.

74. Fair, Tr. 131.

32

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

75. Hoy, Tr. 145-6.

76. Hoy, Tr. 141.

77. Hoy, Tr. 144.

78. Hoy, Tr. 141, 144, 148.

79. Fair, Tr. 132.

80. Hoy, Tr. 141.

81. Hoy, Tr. 146.

82. Hoy, Tr. 146-7.  Ms. Hoy also referred to a "golden triangle," which is an inverted triangle, similar to the top portion of the letter F.  This triangle is visible on slide 12 of Ms. Hoy's presentation, which includes a heat-lamp image showing where users looked when viewing a Google search results page.

83. On May 6-7, 2008, the FTC hosted a Town Hall meeting to explore the evolving mobile commerce marketplace and its implications for consumer protection policy. *See* http://www.ftc.gov/bcp/workshops/mobilemarket/index.shtml.

84. Cerasale, Tr. 160; Huffman, Tr. 158.

85. Cerasale, Tr. 162-3.

86. Cerasale, Tr. 152-3.

87. Cerasale, Tr. 152-3.

88. Cerasale, Tr. 173.

89. Fair, Tr. 132.

90. Cerasale, Tr. 149; Huffman, Tr. 155-6.

91. Huffman, Tr. 155-6.

92. Huffman, Tr. 162.

93. Cerasale, Tr. 149-50.

94. Cerasale, Tr. 151-2.

95. Huffman, Tr. 155-6.

96. Huffman, Tr. 156-7.

97. Huffman, Tr. 156-7; Cerasale, Tr. 161.

98. Huffman, Tr. 156-7; Cerasale, Tr. 161.

99. Cerasale, Tr. 159-60; Huffman, Tr. 162.

100. Hoy, Tr. 146.

101. Hoy, Tr. 146-7.

102. Hoy, Tr. 148.

103. Hoy, Tr. 147.

104. Hoy, Tr. 148.

105. Hoy, Tr. 143-4, 148.

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

106. Hoy, Tr. 148.

107. Hoy, Tr. 148.

108. Hoy, Tr. 145-6; Cerasale, Tr. 149-50; Huffman, Tr. 155.

109. Huffman, Tr. 157.

110. Huffman, Tr. 157.

111. *See also* http://www.ftc.gov/bcp/workshops/negativeoption/presentations/Spector.pdf.

112. Spector, Tr. 176.

113. Spector, Tr. 176.

114. Goldstein, Tr. 177-92; Ms. Goldstein's entire presentation is available at  http://www.ftc.gov/bcp/workshops/ negativeoption/presentations/Goldstein.pdf.  The FTC has modified some of the images in Appendix B to highlight central design aspects, as indicated on each such page.

115. Goldstein, Tr. 183-4.

116. Goldstein, Tr. 186-7.  Ms. Goldstein noted that, from a marketing perspective, the bundled offer does not make business sense because the marketer is risking the primary sale, the pan, by bundling it with the club.

117. Goldstein, Tr. 187-8.

118. Goldstein, Tr. 187.

119. Goldstein, Tr. 188.

120. Goldstein, Tr. 189-90.

121. Goldstein, Tr. 189-92.

122. Goldstein, Tr. 190.

123. Goldstein, Tr. 190.

124. Brendler, Tr. 192-9.  Mr. Brendler's entire presentation is available at http://www.ftc.gov/bcp/workshops/ negativeoption/presentations/Brendler.pdf.  The FTC has modified some of the images in Appendix C to highlight central design aspects, as indicated on each such page.

125. Brendler, Tr. 195.

126. Brendler, Tr. 196.

127. Brendler, Tr. 196.

128. Brendler, Tr. 197.

129. Brendler, Tr. 198.

130. Brendler, Tr. 198-9.

131. Mr. Good's written comments are available at http://www.ftc.gov/bcp/workshops/negativeoption/Good.pdf, and Mr. Mallen's written comments are available at http://www.ftc.gov/bcp/workshops/negativeoption/Mallen. pdf.

132. Good comments at 3; Mallen comments at 1.

133. Good comments at 2.

134. Mallen comments at 1.

135. Good comments at 2.

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

136. Good comments at 2.

137. Good comments at 3.

138. Good comments at 3.

139. Good comments at 3.

140. Good comments at 3.

141. Good comments at 3.

142. Good comments at 3.

143. Good comments at 3.

144. Good comments at 3.

145. Good comments at 3.

146. Good comments at 3.

147. Good comments at 3.

148. Good comments at 4.

149. Good comments at 4.

150. Good comments at 4.

151. Good comments at 4.

152. Good comments at 4; Mallen comments at 1.

153. Good comments at 4; Mallen comments at 1.

154. Good comments at 4.

155. Good comments at 4.

156. Good comments at 4.

157. Good comments at 4.

158. Good comments at 5.

159. Good comments at 5.

160. Good comments at 5.

161. Good comments at 5.

162. Good comments at 5.

163. Good comments at 5.

164. Goldstein, Tr. 179.

165. Goldstein, Tr. 182-3.

166. Goldstein, Tr. 180, 182-5.

167. Goldstein, Tr. 183-4.  ERA noted that the TSR has expressly identified the point at which consumers incur a financial obligation as the time where critical disclosures need to be made, and, therefore, provides guidance for online offers and precedent for ERA's approach.

168. Goldstein, Tr. 185.

35

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

169. Goldstein, Tr. 185.

170. Goldstein, Tr. 194.  Mr. Brendler noted that the *New York Times*, Barnes & Noble, and Monster have signed on to the WebWatch Internet Guidelines.

171. Goldstein, Tr. 197.

172. Good comments at 1.

173. Good comments at 1.

174. Good comments at 1.

175. Good comments at 2.

176. Good comments at 2.  Mr. Good referred to the research of Jakob Nielson, a computer useability expert.  Using eyetracking software, Mr. Nielson found that consumers tend to scan websites in an F-shape pattern.  *See* Nielsen, Jakob, F Shaped Pattern for Reading Web Content (2006).

177. Good comments at 2.

178. Good comments at 2.

179. Good comments at 2.

180. Good comments at 2.

181. Good comments at 2.

182. Good comments at 2.

183. Mallen comments at 2.

184. All of the comments are available at http://www.ftc.gov/os/comments/negativeoptionwrkshop/index.htm.

185. http://www.ftc.gov/os/comments/negativeoptionwrkshop/527292-00007.pdf.

186. *See, e.g.*, *FTC v. JAB Ventures,* No. CV08-04648 (C.D. Cal. 2008); *FTC v. Complete Weightloss Center*, No. 1:08cv00053 (D.N.D. 2008).

187. *See JAB Ventures, supra* n.186; *Complete Weightloss Center, supra* n.186 ; *FTC v. Berkeley Premium Nutraceuticals*, No. 1:06cv00051 (S.D. Ohio 2006); *FTC v. Think All Publ'g*, No. 4:07cv11 (E.D. Tex. 2006); *FTC v. Hispanexo*, No. 1:06cv424 (E.D. Va. 2006); *FTC v. Consumerinfo.com*, No. SACV05-801 (C.D. Cal. 2005); *FTC v. Conversion Mktg.*, No. SACV04-1264 (C.D. Cal. 2004); *FTC v. Mantra Films,* No. CV03-9184 (C.D. Cal. 2003); *FTC v. Preferred Alliance*, No. 103-CV0405 (N.D. Ga. 2003); *United States v. Prochnow*, No. 102-CV-917 (N.D. Ga. 2002); *see also* Sections II.A.4, II.C.2.b, and II.D.2, 3, *supra*.

188. *See JAB Ventures, supra* n.186*; Mantra Films, supra* n.187*; see also supra,* Sections II.A.4, II.B.3, and II.C.2.a.

189. *See, e.g., JAB Ventures, supra* n.186*; Complete Weightloss Center, supra* n.186*; see also* Dot Com Disclosures, *supra* n.3.

190. *See FTC v. Ultralife Fitness, Inc.,* No. 2:08-cv-07655-DSF-PJW (C.D. Cal. 2008); *Complete Weightloss, supra* n.186; *Think All Publ'g, supra* n.187; *Mantra Films, supra* n.187; *United States v. Mazda Motor of America*, No. 8:99cv01213 (C.D. Cal. 1999); *In the Matter of America Isuzu Motors,* FTC Docket No. C-3712 (1996); *see also* Section II.C, *supra*.

191. *See Berkeley Premium, supra* n.187*; Think All Publ'g, supra* n.187; *see also* Section II.C.3, *supra*.

192. *See Ultralife, supra* n.190; *Berkeley Premium, supra* n.187*; Think All Publ'g,, supra* n.187; *see also* Section II.C.3, *supra*.

193. *See* Dot Com Disclosures, *supra* n.3 at 7-8.

194. *See JAB Ventures, supra* n.186*; Complete Weightloss, supra* n.186; *Think All Publ'g, supra* n.187; *In the Matter of Palm*, FTC Docket No. C-4044 (2002); *see also* Section II.C.3, *supra*.

195. *See JAB Ventures, supra* n.186*; Complete Weightloss, supra* n.186; *Think All Publ'g, supra* n.187; *In the Matter of Palm, supra* n.194; *see also* Section II.C.3, *supra*.

196. *See, e.g., JAB Ventures, supra* n.186; *Complete Weightloss, supra* n.186; *Berkeley Premium, supra* n.187; *Think All Publ'g, supra* n.187; *see also* Section II.D.3, *supra*.

197. *See JAB Ventures, supra* n.186; *Complete Weightloss, supra* n.186; *Berkeley Premium, supra* n.187; *Think All Publ'g, supra* n.187; *see also* Sections II.C.3, II.D.2, and II.D.3, *supra*;  http://www.ftc.gov/bcp/conline/pubs/buspubs/dotcom/index.pdf.

198. *See, e.g.*, *Complete Weightloss, supra* n.186; *Berkeley Premium, supra* n.187; *Think All Publ'g, supra* n.187; *Mantra Films, supra* n.187.

199. *See Mantra Films, supra* n.187; *see also* Section II.D.4.b, *supra*.

200. *See Mantra Films, supra* n.187; *see also* Section II.D.4.b, *supra*.

201. *See, e.g., FTC v. Universal Premium Services*, No. CV06-0849 (C.D. Cal. 2006); *FTC v. Remote Response*, No. 06-20168 (S.D. Fla. 2006); *Berkeley Premium, supra* n.187; *Hispanexo, supra* n.187.

202. *See Universal Premium, supra* n.201; *Remote Response, supra* n.201; *Berkeley Premium, supra* n.187*; Hispanexo, supra* n.187; *see also* Sections II.B.3, II.D.2, and II.E, *supra*.

203. *See Universal Premium, supra* n.201; *Remote Response, supra* n.201; *Berkeley Premium, supra* n.187; *Hispanexo, supra* n.187.

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

Appendices: Mock Advertisement Exercise

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

Case: 4:26-cv-01266-HEA   Doc. #: 6-1   Filed: 08/07/26   Page: 97 of 118 PageID #: 632

**Fantastique Cuisine - Shop**

File   Edit   View   Favorites   Tools   Help

Back   |   Search   Favorites   Media

Address   http://www.fantastiquecuisine.com/shop/sautepan   | Go   Links »

# Fantastique Cuisine

Home   Shop   GiftRegistry   Store Locator   Contact Us

**All-Purpose Saute Pan**

The perfect pan for all your cooking needs — great for cooking food quickly over high heat or simmering slowly over low heat to bring out that perfect flavor. The deep design (4 quarts) easily accommodates your favorite stew or even a whole chicken. Plus, it can be used both on the stove top or in the oven.

This attractive and versatile pan is made with a hard enamel exterior and a nonstick interior.

It comes in three beautiful colors to go right from stove to table:

steel gray
bright yellow
cobalt blue

Price: $89.95
S&H: $7.95

**Search**

keyword or item #   GO

Add to cart

Email a friend

Add to registry

▶ View similar items

Terms & Conditions | Site Map | Privacy Policy | Contact Us | Fantastique Cuisine Home

App. A, page 1

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

Case: 4:26-cv-01266-HEA   Doc. #: 6-1   Filed: 08/07/26   Page: 98 of 118 PageID #: 633

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

Case: 4:26-cv-01266-HEA   Doc. #: 6-1   Filed: 08/07/26   Page: 99 of 118 PageID #: 634

File   Edit   View   Favorites   Tools   Help

← Back ▾ → ▾ ⊗ ▣ ⌂ | ⊘Search ▣Favorites ⊛Media ⊛ | ▣▾ ▣ ▣ ▣

Address | http://www.fantastiquecuisine.com/shipping | ▾ | ⌀Go | Links » | ▣ ▾

# Fantastique Cuisine

| Home | Shop | GiftRegistry | Store Locator | Contact Us |

## Shipping Information

**Ship my order to:**

Name*  [                    ]

Address*  [                    ]
[                    ]

City*  [          ]   State*  [      ]▲▼   Zip Code*  [        ]

Daytime Phone*  [          ]

Evening Phone  [          ]

Email*  [              ]

Confirm Email*  [              ]

Shipping Method*  [      ]▲▼   ☐ The shipping address is also my billing address.

▶ **Change Order**
▶ **Cancel Order**

## Payment Information

| Payment Type | Card Number | Expiration | | Verification Number |
|---|---|---|---|---|
| [      ]▼ | [        ] | Month ▼ | Year ▼ | [      ] What is this? |

**Continue**

Terms & Conditions | Site Map | Privacy Policy | Contact Us | Fantastique Cuisine Home

App. A, page 3

Case: 4:26-cv-01266-HEA   Doc. #: 6-1   Filed: 08/07/26   Page: 100 of 118 PageID #: 635

**Fantastique Cuisine - Shop**

File   Edit   View   Favorites   Tools   Help

← Back ▾ → ▾ ⊗ ⟳ ⌂ | ⊕Search ⓐFavorites ⊕Media ⊛ ⊟▾ ⊜ ⊠ ⊟

Address | http://www.fantastiquecuisine.com/review

# Fantastique Cuisine

| Home | Shop | GiftRegistry | Store Locator | Contact Us |

## Review Order

**Ship to:**

**Federal Trade Commission**
**600 Pennsylvania Ave., NW**
**Washington, D 20580**
**(202) 326-0123**

Shipping Method: Standard
Billing address: Same as Shipping address

| Item | Price | Quantity | Total |
|---|---|---|---|
| All-Purpose Saute Pan (cobalt blue) | $89.95 | 1 | $89.95 |
| Gift wrap: Yes | | | |

| | |
|---|---|
| Shipping & Handling: | 7.95 |
| Tax: | 9.00 |
| **Total:** | **$98.95** |

▸ **Change Order**
▸ **Cancel Order**

**Place My Order**

Click button **ONCE** to prevent
duplicate orders

Terms & Conditions | Site Map | Privacy Policy | Contact Us | Fantastique Cuisine Home

App. A, page 4

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

Case: 4:26-cv-01266-HEA   Doc. #: 6-1   Filed: 08/07/26   Page: 101 of 118 PageID #: 636

**Fantastique Cuisine - Shop**

File   Edit   View   Favorites   Tools   Help

Back   Search   Favorites   Media

Address http://www.fantastiquecuisine.com/shop/sautepan

# Fantastique Cuisine

| Home | Shop | GiftRegistry | Store Locator | Contact Us |

**All-Purpose Saute Pan**

The perfect pan for all your cooking needs — great for cooking food quickly over high heat or simmering slowly over low heat to bring out that perfect flavor. The deep design (4 quarts) easily accommodates your favorite stew or even a whole chicken. Plus, it can be used both on the stove top or in the oven.

This attractive and versatile pan is made with a hard enamel exterior and a nonstick interior.

It comes in three beautiful colors to go right from stove to table:

steel gray
bright yellow
cobalt blue

**Search**

keyword or item #   GO

Add to cart

Email a friend

Add to registry

**Price: $89.95**
**S&H: $7.95**

▶ View similar items

With your purchase you'll also enjoy a 30 day free trial membership in the Closet Gourmet Cook's Club with automatic renewal at $4.99/month.

▶ **Click here for Details**

Terms & Conditions | Site Map | Privacy Policy | Contact Us | Fantastique Cuisine Home

Text Circled by FTC Staff

App. B, page 1

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM



App. B, page 2

Text Circled by FTC Staff

Case: 4:26-cv-01266-HEA    Doc. #: 6-1    Filed: 08/07/26    Page: 103 of 118 PageID #: 638



Text Circled by FTC Staff

App. B, page 3

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

Case: 4:26-cv-01266-HEA   Doc. #: 6-1   Filed: 08/07/26   Page: 104 of 118 PageID #: 639

Fantastique Cuisine - Shop

File   Edit   View   Favorites   Tools   Help

Back   Search   Favorites   Media

Address   http://www.fantastiquecuisine.com/shipping

# Fantastique Cuisine

| Home | Shop | GiftRegistry | Store Locator | Contact Us |

## Shipping Information

**Ship my order to:**

Name*

Address*

City*        State*      Zip Code*

Daytime Phone*

Evening Phone

Email*

Confirm Email*

Shipping Method*        ☐ The shipping address is also my billing address.

## Payment Information

Payment Type     Card Number     Expiration          Verification Number
                                 Month   Year                              What is this?

Continue

▶ **Change Order**
▶ **Cancel Order**

You understand that your purchase includes a 30 day free trial membership in the Closet Gourmet Cook's Club and a free recipe box. As a club member you'll enjoy three new recipes emailed to you each month and discount coupons good for valuable savings at some of your favorite restaurants. After your free trial, unless you cancel, your membership will automatically continue for just $4.95 each month which you authorize the Closet Gourmet Cook's Club to charge to the credit card you are providing. You can cancel anytime by calling 1-800-xxxx or online at www.cooksclub.com but keep the recipe box as a free gift from Closet Gourmet

Terms & Conditions | Site Map | Privacy Policy | Contact Us | Fantastique Cuisine Home

Text Circled by FTC Staff

App. B, page 4

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

Case: 4:26-cv-01266-HEA   Doc. #: 6-1   Filed: 08/07/26   Page: 105 of 118 PageID #: 640



Text Circled by FTC Staff

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM



App. B, page 6

Text Circled by FTC Staff

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM



Text Circled by FTC Staff

App. B, page 7

Case: 4:26-cv-01266-HEA   Doc. #: 6-1   Filed: 08/07/26   Page: 108 of 118 PageID #: 643

**Fantastique Cuisine - Shop**

File   Edit   View   Favorites   Tools   Help

←Back ▾ → ▾ ⊗ ◱ ⌂ | ⊗Search ⌂Favorites ⊛Media ⊗ | ⊟▾ ⊜ ⊠ ⊟

Address | http://www.fantastiquecuisine.com/review | ⊘Go   Links ▸ ⊛ ▾

# Fantastique Cuisine

| Home | Shop | GiftRegistry | Store Locator | Contact Us |

## Place Order

**Ship to:**

**Federal Trade Commission**
**600 Pennsylvania Ave., NW**
**Washington, D 20580**
**(202) 326-0123**

Shipping Method: Standard
Billing address: Same as Shipping address

| Item | Price | Quantity | Total |
|---|---|---|---|
| All-Purpose Saute Pan (cobalt blue) Gift wrap: Yes | $89.95 | 1 | $89.95 |

| | |
|---|---|
| Shipping & Handling: | 7.95 |
| Tax | 9.00 |
| **Total:** | **$98.95** |

## Payment Information

Payment Type   Card Number   Expiration   Verification Number

▼ | | Month ▼ | Year ▼ | | What is this?

By clicking "Place My Order" below, you agree to the following:
• Your purchase includes a 30-day free trial membership in Closet Gourmet Cook's Club
• You authorize Cook's Gourmet to obtain your account information from Fantastique Cuisine and to charge your card $4.95/month after the free trial unless you cancel.

▶ **Change Order**
▶ **Cancel Order**

**Place My Order**

Click button **ONCE** to prevent duplicate orders

Terms & Conditions | Site Map | Privacy Policy | Contact Us | Fantastique Cuisine Home

---

By clicking "Place My Order" below, you agree to the following:

• Your purchase includes a 30-day free trial membership in Closet Gourmet Cook's Club

• You authorize Cook's Gourmet to obtain your account information from Fantastique Cuisine and to charge your card $4.95/month after the free trial unless you cancel.

---

Text Circled and Enlarged for Legibility by FTC Staff

App. B, page 8

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM



Text Circled and Enlarged for Legibility by FTC Staff

App. B, page 9

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM



Text Circled and Enlarged for Legibility by FTC Staff

App. C, page 1



Case: 4:26-cv-01266-HEA    Doc. #: 6-1    Filed: 08/07/26    Page: 111 of 118 PageID #: 646

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

**Fantastique Cuisine - Shop**

File   Edit   View   Favorites   Tools   Help

Back · → · | Search | Favorites | Media | | | | |

Address  http://www.fantastiquecuisine.com/shop/sautepan    Go    Links »

# Fantastique Cuisine

| Home | Shop | GiftRegistry | Store Locator | Contact Us |

**Details on your free 30-day trial to Closet Gourmet Cooks Club**

Consumers who purchase the pan will automatically be enrolled in a 30-day free trial of the Closet Gourmet Cook's Club. As a club member, consumers will receive in the mail with the pan a recipe file box for no additional charge.  Consumers will then receive, by e-mail, three gourmet recipes each month.  The recipes are from some of the finest restaurants in New York City, many of them featured in Tagat's top 100.  Consumers also will receive special discount coupons for dining in restaurants throughout the U.S.

After the 30-day free trial, consumers will be charged $4.95 a month for the recipes on the same credit card they used to purchase the pan.  The $4.95 a month charge will show up on credit card statements with the name Closet Gourmet Cook's.

Membership will continue indefinitely unless consumers cancel.  Consumers can cancel at any time – even before the first shipment of recipe cards - and avoid receiving any cards or incurring any financial obligation – by calling 1-800-cookclub, or online at www.closetgourmetcooks.com. If consumers cancel before the first shipment, they can keep the file box.

**Search**
keyword or item #    GO

🛒 Add to cart

✉ Email a friend

🎁 Add to registry

Terms & Conditions | Site Map | Privacy Policy | Contact Us | Fantastique Cuisine Home

Text Circled by FTC Staff

App. C, page 2

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

Text Circled by FTC Staff

App. C, page 3

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM



Text Circled and Enlarged for Legibility by FTC Staff

App. C, page 4

Case: 4:26-cv-01266-HEA    Doc. #: 6-1    Filed: 08/07/26    Page: 114 of 118 PageID #: 649

File   Edit   View   Favorites   Tools   Help

Back → ⊗ 🖺 🏠   Search  Favorites  Media  🖺 🖺 🖨 🖂 🗒

Address  http://www.fantastiquecuisine.com/review    Go   Links »

# Fantastique Cuisine

| Home | Shop | Gift Registry | Store Locator | Contact Us |

## Review Order

**Ship to:**

**Federal Trade Commission**
**600 Pennsylvania Ave., NW**
**Washington, D 20580**
**(202) 326-0123**

| Item | Price | Quantity | Total |
|---|---|---|---|
| All-Purpose Saute Pan (cobalt blue) | $89.95 | 1 | $89.95 |
| Gift wrap: No | | | |

| | | |
|---|---|---|
| **Shipping & Handling:** | 7.95 |
| Tax: | 9.00 |
| One-month trial membership in the Closet Gourmet Cook's Club. Click here for details | FREE |
| **Total:** | **$98.95** |

► Change Order
► Cancel Order

**Place My Order**

Click button **ONCE** to prevent
duplicate orders

Terms & Conditions | Site Map | Privacy Policy | Contact Us | Fantastique Cuisine Home

Text Circled by FTC Staff

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

Case: 4:26-cv-01266-HEA    Doc. #: 6-1    Filed: 08/07/26    Page: 115 of 118 PageID #: 650

Fantastique Cuisine - Shop

Address http://www.fantastiquecuisine.com/shoppingcart

Home | Shop | GiftRegistry | Store Locator | Contact Us

**ERROR! Please complete all fields marked in red.**

You have added the following item(s) to your shopping cart:

All-Purpose Saute Pan (cobalt blue)* ............... 1

Gift Wrap? ........................................ X

Total: $89.95
+ (S&H) 7.95
$97.90

☐ **YES,** enroll me in the 30 day FREE trial to the Closet Gourmet Cook's Club. $4.95 will be charged for each additional month after the 30 day free trial. **Click here for offer details.**

☐ **NO,** I do not want the 30 day free trial to Closet Gourmet Cook's Club.

► Change Order
► Cancel Order

Checkout

Terms & Conditions | Site Map | Privacy Policy | Contact Us | Fantastique Cuisine Home

Text Circled by FTC Staff

App. C, page 6

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

Electronically Filed - St Louis County - June 29, 2026 - 07:14 PM

| FEDERAL TRADE COMMISSION | ftc.gov |
|---|---|
| 1-877-FTC-HELP | FOR THE CONSUMER |